UNITED STATES of America, Appellee,

v.

Virginia CONSUELO–GONZALEZ, Appellant.

No. 73–2122.

United States Court of Appeals, Ninth Circuit.

April 15, 1975.

Charles Sevilla, Federal Defender, Inc. (argued), San Diego, Cal., for appellant.

Stephen W. Peterson, Asst. U. S. Atty. (argued before the panel), James W. Meyers, Asst. U. S. Atty. (argued en banc), Harry D. Steward, U. S. Atty., for appellee.

## OPINION

Before CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Consuelo-Gonzalez appeals from a conviction under 21 U.S.C. § 841(a)(1) for possession of heroin with intent to distribute. We reverse.

Between November 15, 1972, and December 18, 1972, agents of the Federal Bureau of Narcotics and Dangerous Drugs received information from four different sources that Virginia Consuelo-Gonzalez was actively engaged in the importation and sale of heroin. A check of the records at the United States Attorney's Office on December 12, 1972, re-vealed to the agents that Virginia Consuelo-Gonzalez had previously been convicted of heroin smuggling under the name of Virginia Cardenas and was currently on probation. At this time, the agents were also apprised that it was a condition of Consuelo-Gonzalez' probation[1] that she submit her person and property to search at any time upon request by a law enforcement officer. On December 14, 1972, an independent verification was made of the fact that Virginia Cardenas and Virginia Consuelo-Gonzalez were one and the same person; and on December 19, 1972, the agents reconfirmed the probationary status and condition that she submit to search.

On the morning of December 19, 1972, at approximately 9:30 a. m., federal and local law enforcement officers approached the Consuelo-Gonzalez residence for purposes of conducting a search of the premises. When they arrived, they found the front door of the house ajar. The agents knocked on the door and waited for Consuelo-Gonzalez to appear. When she did so, the lead agent showed her his identification, informed her that he was aware of her probation and the conditions which had been attached to it, and indicated his intention to enter the residence and conduct a search. Consuelo-Gonzalez responded to his request by stepping back and saying "Sure, search my purse." Upon entering the house, the lead agent made a cursory search of her handbag to determine whether it contained weapons. None were found. The handbag was then placed beside a chair in which Consuelo-Gonzalez was asked to sit.

A thorough search of Consuelo-Gonzalez' person and residence was then commenced. In the bedroom, the agents found a narcotics injection outfit in a

---

1. The judgment and probation order of the district court reads in pertinent part as follows:

It is adjudged that the defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of one (1) year and execution of sentence is suspended and defendant is placed on probation for a period of three (3) years on condition that she obey all laws, Federal, State and Municipal, that she comply with all lawful regulations of the Probation Department, that she not possess or use narcotics, marihuana, LSD, or dangerous drugs in any form, that she not enter Mexico nor approach the Mexican border, that she submit to search of her person or property at any *time when requested by a law-enforcement officer* and that she remain fully employed. (emphasis added)

dresser; and on a shelf in the living room they discovered a paper sack containing a bundle of notebook papers with brown powder debris on them. Both of these items were seized. A second search of Consuelo-Gonzalez' handbag revealed two coin purses, inside of which the agents found two white paper bindles and seven rubber condoms containing a total of 11.7 grams of brown powder, later proven to be heroin. This evidence was also seized, and subsequently used to provide the basis for the present conviction.

In a timely and appropriate manner, counsel for Consuelo-Gonzalez moved to suppress this evidence. However, the trial judge denied the motion to suppress, relying specifically upon the authorization to search which had been made a condition of the probation to which Consuelo-Gonzalez was subject. Thereafter, defendant was found guilty of possession of heroin with intent to distribute in a proceeding before the court on stipulated facts.

In this appeal, defendant asserts that the trial court erred in failing to suppress the evidence on the ground that the condition of probation requiring her to "submit to search of her person or property at any time when requested by a law-enforcement officer" was improper and thus could not serve to make the search lawful. It is argued that the Fourth Amendment requires this result.

While we are not prepared to embrace the full reach of defendant's argument, we do believe that the condition employed in the instant case is not in keeping with the purposes intended to be served by the Federal Probation Act.[2] It is our view that, even though the trial judge has very broad discretion in fixing the terms and conditions of probation, such terms must be reasonably related to the purposes of the Act. In determining whether a reasonable relationship exists, we have found it necessary to give consideration to the purposes sought to be served by probation, the extent to which the full constitutional guarantees available to those not under probation should be accorded probationers, and the legitimate needs of law enforcement. Having done so, we have concluded that Consuelo-Gonzalez could have been required to submit her person and property to search by a probation officer. We have further concluded that any search made pursuant to the condition included in the terms of probation must necessarily meet the Fourth Amendment's standard of reasonableness. This requirement follows from our decision in Latta v. Fitzharris, 521 F.2d 246 (9th Cir. 1975) in which under the compulsion of the Fourth Amendment we imposed the standard of reasonableness on searches of California parolees by California parole officers. The reasons we articulated there for imposing the standard are equally applicable here.

2. Title 18 U.S.C. § 3651 reads in part as follows:

§ 3651. Suspension of sentence and probation.

Upon entering a judgment of conviction of any offense not punishable by death or life imprisonment, any court having jurisdiction to try offenses against the United States when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby, may suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such terms and conditions as the court deems best.

\* \* \* \* \* \*

The court may revoke or modify any condition of probation, or may change the period of probation.

The period of probation, together with any extension thereof, shall not exceed five years.

While on probation and among the conditions thereof, the defendant—

May be required to pay a fine in one or several sums; and

May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had; and

May be required to provide for the support of any persons, for whose support he is legally responsible.

\* \* \* \* \* \*

■ Although it is doubtful that any formulation of a condition relating to the search of a probationer's person or property can be drafted that will provide unambiguous guidance to both the probationer and the probation officer, it is suggested that the following condition would properly reflect the views expressed herein:

That she submit to search of her person or property conducted in a reasonable manner and at a reasonable time by a probation officer.

Measured by the authority which the above condition bestows and recognizing, as we must, that no greater authority is consistent with the Federal Probation Act, we hold that the search in this case was improper and that the motion to suppress should have been granted.

As already indicated, the support for, and implications of, this position spring from three sources *viz.*, the underlying purposes which Congress intended to serve in promulgating the Federal Probation Act, the scope of constitutional protections which are available to probationers generally, and certain aspects of the law enforcement process as they relate to probation. To each of these we now turn.

## I.

*Purposes of the Federal Probation Act.*

Because our holding is based in part on our reading of the Federal Probation Act, it is necessary to examine the Act and its purposes. A suitable starting point is United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309 (1928), where the Supreme Court, in reviewing the history of the Act, pointed out that the purpose underlying its enactment in 1925 had been to provide ". . . an amelioration of the sentence by delaying actual execution or providing a suspension so that the stigma might be withheld and an opportunity for reform and repentance be granted before actual imprisonment should stain the life of the convict." [3] Its aim was to complement parole and executive clemency, not to supplant either. The Court said, "Probation is the attempted saving of a man who has taken one wrong step and whom the judge thinks to be a brand who can be plucked from burning at the time of the imposition of the sentence." [4] Nor has anything in the several amendments to the 1925 Act [5] suggested that rehabilitation has ceased to be the central objective of the probation process which it established. [6] The theme that rehabilitation underlies probation is mirrored not only in the probation systems established under state law, [7] but also in the Model Penal Code, which expressly recognizes rehabilitation by authorizing the imposition of any conditions of probation "reasonably related to the rehabilitation of the defendant and not unduly restrictive of his liberty or incompatible with his freedom of conscience." [8]

**3.** 275 U.S. at 357, 48 S.Ct. at 149.

**4.** *Id.* at 358, 48 S.Ct. at 149.

**5.** The Act has been amended five times since it was initially promulgated by Congress in 1925. Mar. 4, 1925, ch. 521, § 1, 43 Stat. 1259; June 25, 1948, ch. 645, 62 Stat. 842; June 20, 1958, Pub.L. 85–463, § 1, 72 Stat. 216; Aug. 23, 1958, Pub.L. 85–741, 72 Stat. 834; Oct. 22, 1970, Pub.L. 91–492, § 1, 84 Stat. 1090; May 11, 1972, Pub.L. 92–293, § 1, 86 Stat. 136. In none of these amendments was the concept of rehabilitation as the ultimate goal of probation undercut. Rather, it seems evident that the changes which occurred were aimed at broadening the availability of probation and emphasizing its rehabilitative theme.

**6.** The centrality of this objective has been recognized both by the Supreme Court, *see, e. g.,* Roberts v. United States, 320 U.S. 264, 272, 64 S.Ct. 80, 88 L.Ed. 459 (1943); Korematsu v. United States, 319 U.S. 432, 435, 63 S.Ct. 1124, 87 L.Ed. 1497 (1942), and by those who comment on the probation process. *See, e. g.,* Note, Judicial Review of Probation Conditions, 67 Colum.L.Rev. 181 (1967); Best and Birzan, Conditions of Probation: An Analysis, 51 Geo. L.J. 809 (1963).

**7.** *See, e. g.,* People v. Keller, 245 Cal.App.2d 711, 54 Cal.Rptr. 154 (1966); People v. Taylor, 178 Cal.App.2d 472, 3 Cal.Rptr. 186 (1960); Delaney v. State, 190 So.2d 578 (Fla.1966); People v. Molz, 415 Ill. 183, 113 N.E.2d 314 (1953); People v. Thomas, 121 Ill.App.2d 422, 257 N.E.2d 480 (1970); Mottram v. State, 232 A.2d 809 (Me.1967); State v. Shannon, 60 Wash.2d 883, 376 P.2d 646 (1962).

**8.** Model Penal Code, § 301.1(2)(1), Proposed Official Draft (1962).

Less guidance is provided by the Federal Probation Act as to the actual fixing of probationary conditions. Aside from authorizing fines, restitution, providing for the support of persons the probationer is legally obligated to support, and subjection to certain types of treatment,[9] the court is permitted to impose such terms and conditions as it "deems best." Thus, quite properly this court, as well as others, has construed the Act to vest great discretion with respect to the granting of probation and the fixing of its conditions in the court having jurisdiction over the convicted defendant.[10]

Nonetheless, limits to the exercise of this discretion have been recognized. For example, in Porth v. Templar, 453 F.2d 330 (10th Cir. 1971), it was held that the Act did not permit the imposition of a condition restricting the defendant's right to speak so long as he did not urge others to violate the law. Permissible conditions must "have a reasonable relationship to the treatment of the accused and the protection of the public." [11] Similarly, this court has summarily rejected the condition that the probationer donate a pint of blood to the Red Cross Blood Bank.[12] Moreover, it is virtually certain that those restraints that have been held improper when placed on prisoners and parolees will also be unsuitable as probation conditions. As an example, it is unlikely that probation can be conditioned on the probationer refraining from communicating his views on the probation system or receiving and reading certain periodicals which are otherwise lawfully available. *Cf.* Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971) (prisoner's right to send letters); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970) (prisoner's right to receive periodicals).

■ The guiding principle which has emerged in construing the Probation Act is that the only permissible conditions are those that, when considered in context, can reasonably be said to contribute significantly both to the rehabilitation of the convicted person and to the protection of the public. In Porth v. Templar, *supra*, the Tenth Circuit has expressed this principle as follows:

> The sentencing judge has a broad power to impose conditions designed to serve the accused and the community. The only limitation is that the conditions have a reasonable relationship to the treatment of the accused and the protection of the public. 453 F.2d at 333.

This must be, as the Act indicates, a very flexible standard. Nor could it be otherwise in the light of our uncertainty about how rehabilitation is accomplished. *See, e. g.,* The Challenge of Crime in a Free Society: A Report by the President's Commission on Law Enforcement and Administration of Justice 159–185 (1967); Task Force Report: Corrections 1–16 (1967); Pettibone, Community-Based Programs: Catching up with Yesterday and Planning for Tomorrow, 37 Fed.Prob. 1 (Sept., 1973); Pepper, Prisons in Turmoil, 36 Fed.Prob. 3 (Dec., 1972); Morris and Hawkins, Rehabilitation: Rhetoric and Reality, 34 Fed.Prob. 9 (Dec., 1970); Jorgensen, Crime in a Free Society: Choice or Challenge, 34 Fed.Prob. 14 (March, 1970).

## II.

*Scope of Constitutional Protections Available to Probationers.*

■ This guiding interpretive principle plainly suggests the manner in which the Act's administration should be accommodated to the constitutional

9. 18 U.S.C. § 3651.

10. *See* Burns v. United States, 287 U.S. 216, 220–22, 53 S.Ct. 92, 77 L.Ed. 511 (1932). *See also* Trueblood Longknife v. United States, 381 F.2d 17, 19 (9th Cir. 1967); Kaplan v. United States, 234 F.2d 345, 348 (8th Cir. 1956).

11. 453 F.2d at 333.

12. Springer v. United States, 148 F.2d 411, 416 (9th Cir. 1945).

guarantees of the Bill of Rights. While it must be recognized that probationers, like parolees and prisoners, properly are subject to limitations from which ordinary persons are free, it is also true that these limitations in the aggregate must serve the ends of probation.[13] Conditions that unquestionably restrict otherwise inviolable constitutional rights may properly be subject to special scrutiny to determine whether the limitation does in fact serve the dual objectives of rehabilitation and public safety. But this is not to say that there is any presumption, however weak, that such limitations are impermissible.[14] Rather, it is necessary to recognize that when fundamental rights are curbed it must be done sensitively and with a keen appreciation that the infringement must serve the broad purposes of the Probation Act. This burden cannot be avoided by asserting either that the probationer has voluntarily waived his rights by not objecting in a proper manner to the conditions imposed upon him or that he must accept any condition the court "deems best" as a consequence of being "in custody."[15]

Turning to the Fourth Amendment rights that Consuelo-Gonzalez insists were infringed, two things are obvious. The first is that some forms of search by probation officers are not only compatible with rehabilitation, but, with respect to those convicted of certain offenses such as possession and distribution of narcotics, are also essential to the proper functioning of a probationary system.

The second is that the condition imposed on Consuelo-Gonzalez literally permits searches which could not possibly serve the ends of probation. For example, an intimidating and harassing search to serve law enforcement ends totally unrelated to either her prior conviction or her rehabilitation is authorized by the terms of the condition. Submission to such searches should not be the price of probation. A probationer, like the parolee, has the right to enjoy a significant degree of privacy. See Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

It is our view that the approach which we adopted in Latta v. Fitzharris, 521 F.2d 246 (9th Cir. 1975) in fixing the proper limits of search by a parole officer is applicable here. In *Latta*, it was recognized that there was often a conflict between the very practical needs of the parole system, which required both visits and searches, and the parolee's right to privacy. The conceptual framework within which we balanced these interests recognized the uniqueness of the relationship between the parole officer and his parolee and was fashioned from the raw material provided by the rules relating to both ordinary and administrative searches. *Id.* at 249–250. Our use of this framework yielded the conclusions that a parole officer need not have probable cause and that a warrant need not be obtained prior to the search. We recognized that the "parole authorities [have] a special and unique interest in

---

**13.** *See* Note, Judicial Review of Probation Conditions, 67 Colum.L.Rev. 181, 203 (1967).

**14.** Merely because a convicted individual's fundamental rights are involved should not make a probation condition which limits those rights automatically suspect. The development of a sensible probationary system necessarily requires that the trial court be vested with broad discretionary powers. It also requires that any condition which is imposed following conviction, whether or not it touches upon "preferred" rights, must be viewed in the context of the goals underlying the Act. Thus, the crucial determination in testing probationary conditions is not the degree of "preference" which may be accorded those rights limited by the condition, but rather whether the

limitations are primarily designed to affect the rehabilitation of the probationer or insure the protection of the public.

**15.** *Compare*, Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (prescribing minimum procedural safeguards required by due process when a state seeks to revoke parole). Implicit in *Morrissey* is a rejection of the custody and contract theories as justifications for summary revocations of parole. The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 96 n. 7 (1972). *See generally* Comment, The Parole System, 120 U.Pa.L.Rev. 282, 286–300 (1971). We feel that the custody and contract theories are equally inappropriate when applied in the probation setting.

invading the privacy of parolees under their supervision." *Id.* at 249.

■■ The conclusions are equally applicable to the situation before us. Probation authorities also have a special and unique interest in invading the privacy of probationers. This special and unique interest does not extend to law enforcement officers generally. To interpret the Federal Probation Act in such an expansive manner would not be reasonably related to the Act's purposes. For this reason we interpret the Act to require that searches of probationers not otherwise in compliance with the usual standards of the Fourth Amendment be by, or under the immediate and personal supervision of, probation officers. Inasmuch as the search of Consuelo-Gonzalez' residence and handbag occurred neither during the course of a probation visit by a probation officer nor pursuant to a proper warrant, the evidence must be suppressed.

■ However, we wish to make clear that our interpretation of the Federal Probation Act countenances activities by probation officers other than those specifically before us in Latta v. Fitzharris. For example, it may well be necessary during the course of a probation visit to conduct a pat-down search for weapons or contraband, to examine the probationer's arms to ascertain whether drugs are being used, or take the probationer into custody. When done reasonably and humanely by probation officers, no question concerning the appropriateness of their actions should arise. Moreover, a thorough search of a probationer's residence incident to, or following, a probation visit is not dependent upon the establishment of probable cause. A reasonable belief on the part of the probation officer that such a search is necessary to perform properly his duties is

sufficient. As we said in Latta v. Fitzharris, this belief may be based on a "hunch" having its origin in what the probation officer has learned or observed about the behavior and attitude of the probationer.

It is our belief that reasonable restraints on probationers are necessary to promote the use of probation as an alternative to incarceration. The absence of such controls would unnecessarily increase the hazards to the public resulting from the generous use of probation. This would in turn only create public resistance to such use, and ultimately lead to an increase in the bitter harvest we have come to expect as the consequence of imprisonment. It is obvious, however, that opinions differ as to what controls are improper, and we express no opinion here regarding the extent to which the states constitutionally may impose conditions more intrusive on the probationer's privacy than those we here have indicated are proper under the Federal Probation Act.[16] For this reason we express no opinion regarding the decision of the Supreme Court of California in People v. Mason, 5 Cal.3d 759, 97 Cal. Rptr. 302, 488 P.2d 630 (1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1289, 31 L.Ed.2d 478 (1972), which permitted contraband, discovered by means of a search by police officers pursuant to a probation condition similar to that before us, to be used in obtaining the conviction of a probationer for the offense to which the contraband related.[17]

### III.

*Law Enforcement Aspects.*

■ In describing the purposes of the Federal Probation Act, the emphasis to this point has been upon the rehabilitation of the probationer. Probation, how-

---

16. *Cf.* Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring); Kent v. Dulles, 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958).

17. There exists some dispute about the scope of the holding of People v. Mason. *See,* Peo-

ple v. Constancio, 42 Cal.App.3d 533, 116 Cal. Rptr. 910 (1974); People v. Bremmer, 30 Cal. App.3d 1058, 106 Cal.Rptr. 797 (1973). Whatever its precise holding may be, it is not our intention to express an opinion concerning its constitutionality.

ever, has law enforcement aspects. Because of this, conditions which serve to protect the public from recidivism by the probationer or to deter others by way of example are not contrary to the purposes of the Act so long as all the conditions construed together serve substantially the purpose of rehabilitation.

Moreover, nothing said here is intended to preclude mutually beneficial cooperation between probation officers and other law enforcement officials. For example, a proper visitation by a probation officer does not cease to be so because he is accompanied by a law enforcement official. Nor is an ordinary law enforcement official precluded from seeking the probationer's consent to conduct a search provided no coercion, actual or threatened, is employed. The probationer's refusal to accede to such a request makes it necessary either that the matter be referred to the probation officer or that a warrant be obtained. However, under no circumstances should cooperation between law enforcement officers and probation officers be permitted to make the probation system "a subterfuge for criminal investigations." See Latta v. Fitzharris, 521 F.2d 246 (9th Cir. 1975).

Finally, nothing said here is intended to pass on the issue of whether contraband found as a result of an improper probation search may be considered in a probation revocation proceeding. All that is decided here is that such contraband can not be used to obtain a new conviction for the offense with respect to which probation has not been granted.

The defendant's motion to suppress should have been granted.

Reversed.

CHOY, Circuit Judge:

I concur in the majority opinion except as to the statement at page 266 reiterat-

ing the approbation given in the majority opinion in Latta v. Fitzharris to mere hunch as a basis of reasonable belief for a warrantless search by a parole/probation officer of a parolee's/probationer's residence.

For the reasons stated in my concurring opinion in Latta, I think the statement is ill-advised.

Circuit Judge MERRILL concurs in this concurring opinion.

HUFSTEDLER, Circuit Judge, with whom Circuit Judges BROWNING and ELY join, concurring specially:

I agree with the majority that the search was illegal. I disagree with the majority's dictum that the search would have been legal if it had been made by a probation officer.

I concur in the majority's rationale that (1) the district court's broad discretion in imposing conditions of probation is subject to the limitations that no condition of probation can be imposed that is not reasonably related to the rehabilitative purposes of the Federal Probation Act (18 U.S.C. § 3651) and to the legitimate needs of law enforcement in protecting the public; and (2) a condition of probation that infringes a probationer's constitutionally protected right to be free from unreasonable searches and seizures cannot be deemed to be reasonable.[1] The condition of probation in question failed on both counts and therefore could not be relied upon to justify this search. That determination disposes of this case because no ground exists, other than the probation condition, which arguably could validate the search.

I cannot concur in the majority's essay purporting to validate warrantless searches of probationers' persons and dwellings (whether or not based on a

---

1. The majority's view on these points is solidly supported by the recommendations of leading authorities in the field of probation. National Advisory Comm'n on Criminal Justice Standards and Goals, Corrections (1973), standard 16.11; American Bar Ass'n Project on Standards for Criminal Justice, "Standards Relating to Probation" (1970), standard 3.2; American Law Institute, Model Penal Code (1962) §§ 301.1, 305.13; cf. Sweeney v. United States (7th Cir. 1965) 353 F.2d 10, 11; Springer v. United States (9th Cir. 1945) 148 F.2d 411, 416; In re Bushman (1970) 1 Cal.3d 767, 776–77, 83 Cal.Rptr. 375, 380–81, 463 P.2d 727.

probation condition), subject only to the limitation that the search must appear reasonable in some post-search proceeding in which the admissibility of the fruits of the search is questioned. I have fully expressed my view that a warrant is required to sustain a search by a parole officer of his parolee's home, unless the particular search falls within one of the heretofore clearly delineated exceptions to the warrant requirement. (Latta v. Fitzharris (9th Cir. 1975), *ante,* 521 F.2d 246, 254 (op'n, Hufstedler, J., dissenting).) The same reasoning applies to a probation officer's searches of his probationer's person and home.

A probationer has no less Fourth Amendment protection than a parolee. Indeed, his expectations of privacy may be somewhat greater than a parolee's, because the rehabilitative goals of probation are perhaps more pronounced than those of parole, and the societal threat posed by granting a person probation may be less than that posed by paroling a prisoner. I need only to add that, as in *Latta,* statutes and regulations applicable to the searching officer's conduct of searches of his charge are nonexistent.

EUGENE A. WRIGHT, Circuit Judge, joined by GOODWIN and WALLACE, Circuit Judges, dissenting:

I respectfully dissent.

After her conviction, under the name of Virginia Cardenas, for smuggling heroin, this appellant was placed on probation on November 21, 1971. In suspending execution of appellant's one-year prison sentence, the district judge imposed certain conditions on the probation order which are detailed in footnote one of the plurality opinion. These conditions, deemed appropriate by the district judge in the exercise of his discretion, made clear to the defendant that she must lead a law-abiding life, refrain from the possession or use of narcotics, and not enter Mexico during the period of her probation. They also included a requirement that she "submit to search

of her person or property at any time when requested by a law-enforcement officer."

In the following few months appellant took no appeal from the judgment and probation order, and made no motion to the district court to have the sentence modified or clarified under Fed.R. Crim.P. 35. *See generally* ABA Project on Standards for Criminal Justice, Standards Relating to Probation (Approved Draft 1970) at 43–44. In short, she accepted probation and we may assume that she also accepted the conditions as an alternative to serving a prison term.

Less than a year passed before she was reported by informants to have again become involved in smuggling heroin across the Mexican border and selling it in the San Diego, California area. According to the stipulated facts, she had already violated three of the conditions of probation when agents undertook the search here in question. On the assumption that this might be the case, three federal agents and several San Diego police officers converged on a residence from which she had been seen departing several days earlier. When she came to the door, Agent Dersham showed her his identification, and informed her of the officers' intention to search her residence under the authority of the probation order. Appellant offered no active opposition as the officers proceeded to search her house and person, and thereby discover the evidence which she claims should have been suppressed.

From these facts, the plurality concludes that the search was unlawful. Without reaching the constitutional issue, the plurality opinion dismisses the condition relied upon by the officers as "not in keeping with the purposes intended to be served by the Federal Probation Act," recited in footnote 2 of the plurality opinion. Evidence from warrantless searches of the type involved here must therefore be suppressed, they argue, at least when the search is con-

ducted without a probation officer present.

It seems to me that the plurality opinion is fundamentally wrong because: (a) it unduly interferes with the discretion given to district judges by the Federal Probation Act; (b) it puts unreasonable burdens on probation officers by requiring that searches may be made only by them; (c) it ignores the well-established concept that probation is not a right, but a discretionary affirmative correctional tool, the use of which must be rooted in the facts and circumstances of each case; and (d) it ignores the need to impose conditions for the protection of the public.

As the plurality opinion concedes, "the trial judge has very broad discretion [under the Federal Probation Act] in fixing the terms and conditions of probation." Plurality op. at 262. *See also* Burns v. United States, 287 U.S. 216, 220–23, 53 S.Ct. 92, 77 L.Ed. 511 (1932). This court has recently reaffirmed the proposition that, under the Act, a convicted criminal may be subjected, as a condition of his probation, to restrictions on his expression and associations. Malone v. United States, 502 F.2d 554 (9th Cir. 1974). *Cf.* Morrissey v. Brewer, 408 U.S. 471, 477–80, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (noting with apparent approval various conditions placed on parolees which "restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen," *id.* at 478, 92 S.Ct. at 2598). We have affirmed such conditions even where they have involved some prior restraint on free expression, and even though we might have found their language unduly vague if we had instead been reviewing a similarly-worded criminal statute.[1]

In those cases where we have reviewed conditional probation orders, our principal inquiry was whether each condition could be justified as reasonably related to the goals of preventing a repetition of the probationer's offense, and

of successfully reintegrating him into society. *See* United States v. Nu-Triumph, Inc., 500 F.2d 594, 596 (9th Cir. 1974); *see also* Porth v. Templar, 453 F.2d 330, 333 (10th Cir. 1971).

In *Malone*, this court upheld challenged conditions of probation including ones that the defendant not belong to or participate in any Irish or Irish Catholic organizations or groups, and that he not visit any Irish pubs nor accept any employment which would associate him with any Irish organization or movement. 502 F.2d at 557. In doing so, we relied principally on the district judge's determination that Malone's "tremendous emotional involvement" in the Irish Republican movement underlay his conviction for unlawful exportation of firearms to the United Kingdom.

In *Nu-Triumph*, this court stated:

"We hold that the condition of probation imposing some restriction on the Corporation's First Amendment liberties does not impermissibly impinge the Corporation's freedom under the First Amendment. . . .

The granting of a sentence of probation in lieu of custody or fine in the first instance as well as the terms and conditions of the probation granted rests within the sound discretion of the sentencing district court . . .; and such judicial discretion in probation matters is limited only by the requirement that the terms and conditions thereof bear a 'reasonable relationship to the treatment of the accused and the protection of the public.'

. . .

It must be manifest to all that the intent of the district court in granting any probationary term at all was to rehabilitate the Corporation's activities and to protect the public from future commissions of crime by the Corporation in the field of unlawful obscene printed media." [Citations omitted.]

500 F.2d at 596.

1. Where a probationer found a condition unduly vague, his ordinary remedy would be to petition the sentencing court for a modification or clarification of the condition, rather than for its wholesale invalidation.

A number of other courts have found that Fourth Amendment restrictions, like conditions on First Amendment freedoms, may further the goals of the probation system in certain types of cases. We were told at oral argument that the district judges in the Southern District of California had been employing this condition in drug-related cases for about five years. We know from the California Supreme Court decisions, some of which are cited by the plurality, that the trial judges of that state have long been imposing similar conditions. People v. Mason, 5 Cal.3d 759, 97 Cal.Rptr. 302, 488 P.2d 630 (1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1289, 31 L.Ed.2d 478 (1972), is still the law of that state.[2]

The selective use of search conditions is reflective of a more general trend observed in drug-related cases in the Southern District of California and elsewhere. In such cases, we have seen increased use by district judges of special conditions tailored specifically for the problems associated with drug trafficking and drug abuse. Typical is the requirement that the probationer report regularly, often weekly, for urinalysis to test for drug use.

The provision for search of person or property without a warrant has proved to be another useful technique, not because many such searches were made, but because probationers knew they might be made. As such, it is exactly the type of condition envisioned in the Federal Probation Act's authorization for district judges to place convicted defendants on probation "for such period and upon such terms and conditions as the court deems best." 18 U.S.C. § 3651 (1970).[3]

The plurality opinion recognizes that searches by probation officers are compatible with rehabilitation and that a condition of probation thus limiting search would be reasonable. There are two things wrong with that. First, probation officers occupy a special relationship with their probationers. It is one of mutual trust and confidence. Cf. Gagnon v. Scarpelli, 411 U.S. 778, 783–85, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Morrissey v. Brewer, 408 U.S. 471, 477–80, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Probation officers prefer not to make searches or arrests, although authority to arrest for cause, without a warrant, is granted by statute. Operations Manual of the United States Probation System, November 21, 1973, § 4.12. That section of the manual adds:

> Probation officers are cautioned, however, that it generally is not good practice for them to arrest probationers. The arrest should be made by the marshal.

Second, the plurality view is incorrect in that it contemplates that probation officers will have regular and frequent opportunities to search in the course of regular home visits. The plurality says:

> For example, it may well be necessary during the course of a probation visit to conduct a pat-down search for weapons or contraband, to examine the probationer's arms to ascertain whether drugs are being used, or take the probationer into custody. When done reasonably and humanely by probation officers, no question concerning the appropriateness of their actions should arise. Moreover, a thorough search of a probationer's residence incident to, or following, a probation visit is not dependent upon the establishment of probable cause.

Plurality opinion at 266.

Trial judges and probation officers know that probation just does not oper-

---

**2.** *But compare* People v. Superior Court, 117 Cal.Rptr. 433, 12 Cal.3d 834, 528 P.2d 41 (1974) (en banc) ("whenever requested" language in subjection to search condition on probation interpreted to require notice to probationer before search of his premises).

**3.** It is also entirely consistent with what I think may be the best characterization of the probationary status itself, that of a "reforming discipline." *See* Korematsu v. United States, 319 U.S. 432, 435, 63 S.Ct. 1124, 87 L.Ed. 1497 (1943), quoting Cooper v. United States, 91 F.2d 195, 199 (5th Cir. 1937).

ate this way. Because of the caseloads carried by most probation officers, because of the special relationship between them and their probationers, and because of geographical considerations, home visits rarely take place.

Probationers living within close proximity to a probation office may be required to make monthly visits to see the probation officer. More frequently, they merely check in by telephone or mail. ABA Standards Relating to Probation, *supra*, § 6.2.

In the western states comprising this circuit are dozens of small communities in isolated counties where there are no probation officers, either state or federal. In remote areas in Nevada and Montana, for example, there would be no probation officer nearer than 200 miles. The federal probation office at Sacramento has responsibility for the entire 25-county area comprising the northern part of the Eastern District of California, which means that some probationers may reside nearly 300 miles afield from their officers. To suggest that probation officers should make occasional or frequent home visits to probationers in such areas is unrealistic.

It is more reasonable, I suggest, for those probationers and for those living in metropolitan communities to be under regular observation by law enforcement officers who, in turn, would be expected to communicate violations or crisis situations to the nearest probation officers. Similarly, it would be law enforcement officers who should know when, if and how to make a search. But the plurality opinion would not let this happen unless the probation officer was personally present directing the search or accompanying the law enforcement official.

We were told at oral argument that the special condition of probation here in question was often employed by district judges at the suggestion of probation officers. This carries more than a mere suggestion that the condition is deemed by the probation staff to be not only necessary but reasonable, consistent with their own assisting role as expert professionals.

It was also conceded at oral argument that if the district judges may no longer impose this condition, they may be unwilling to assume the greater risk, and that more defendants would go to jail or prison. This will be an unfortunate result and would deprive many criminal defendants of an opportunity that they might have had to prove their reliability under conditions better suited to their rehabilitation.

It is well known to state and federal trial judges that:

> Probation has advantages to society. It also has risks. In granting probation, the judge is weighing the risks against the benefits.

National College of the State Judiciary, Sentencing and Probation (1973), at 337.

Sentencing judges are willing to assume some risks, but not too many.[4] It has been said:

> Since there is a high probability that these men will return to crime, close surveillance of their conduct is necessary to increase the likelihood that they will be effectively rehabilitated. To assess the validity of the present restrictions on parolees' or probation-

---

4. It has been recognized that, even in the best of circumstances, the decision to grant probation involves "a calculated risk based on the court's belief that the offender is suitable for rehabilitation through return to the community under probation supervision. Such a belief is founded on many factors, some tangible, some rather intangible. And when it developes [sic] that the Judge's confidence has been misplaced, prompt steps may be taken to protect both the public, and the probationer." United States v. Allen, 349 F.Supp. 749, 753 (N.D.Cal. 1972).

Hence, it seems inevitable that taking away the district judge's discretion to impose what he considers justifiable conditions allowing reasonable searches by law enforcement officials will foreclose probation for at least some defendants who would now be given probation under conditions similar to those here at issue.

ers' Fourth Amendment rights, then, it is necessary to determine whether the ends served by these restrictions are sufficient to outweigh the resulting loss of privacy to a class of citizens. W. White, The Fourth Amendment Rights of Parolees and Probationers, 31 U.Pitt.L.Rev. 167, 180–81 (1969).[5]

The plurality opinion's inadequate attention to the probable effect of its holding on the use of probation as an affirmative corrective tool seems to result from its correlative failure to recognize the importance of public protection considerations in determining the terms on which probation should be granted, if it is to be granted at all.[6] While the plurality opinion speaks at one point of the "dual objectives of rehabilitation and public safety,"[7] its discussion of the Probation Act's purposes places much greater emphasis upon the former objective. The plurality concludes that the end of public protection can never alone justify probation conditions which permit an intrusion into a probationer's privacy as serious as that resulting from the search challenged here. Such an intrusion, they say, promotes neither the Act's rehabilitative goals nor the proper functioning of the parole system.

This reasoning, while serving to avoid consideration of the difficult constitutional issues raised by cases like People v. Mason, *supra*,[8] overlooks several fundamental facts about the probation system. First of all, it fails to recognize that it is essential to successful operation of the probation system that probationers be required to lead law-abiding lives. Secondly, it usurps the discretion the Probation Act vests in the trial judge as

the one best situated to balance the importance of any condition to the Act's goals against the resulting infringements on a probationer's civil liberties. In this type of case, the trial judge might properly conclude that a given probationer's prospects of rehabilitation would be substantially improved by this type of condition.

One reason for leaving this determination to the district judge, within broad parameters, is that in actual practice it is difficult to establish any absolute rules regarding the best means to achieve the rehabilitative and public safety goals of the Act. In the first place, the two concepts are to a significant degree interrelated. As noted above, strict supervision may actually promote the rehabilitative goal while affording greater public protection. At the same time, effective rehabilitation is the best form of public protection in the long run.

Secondly, even if one were to assume that rehabilitation were the "primary" goal of the Federal Probation Act, this would not mean that it must be the exclusive one, or that every condition on probation must relate directly to it. Early cases interpreting the Act do contain language showing Congress' great concern with diverting wayward youths from lives of crime.

But this goal also addresses the desire to protect the public, since the hope is that by assisting the rehabilitation of those convicted of less serious crimes, they will be dissuaded from turning to more serious ones. In any event, it seems unwise to read these cases as reflecting any paucity of congressional interest in accommodating the Act's reha-

---

5. The possibility of recidivism among probationers is much more than mere speculation. A recent study of adults granted probation by 56 of the 58 county courts in California from 1956 to 1958 showed that by the end of 1962, 28% of more than 11,000 probationers had been taken off probation because almost half of them had committed new offenses and others had absconded or would not comply with regulations. 31 U.Pitt.L.Rev. at 180.

6. *See* The Supreme Court, 1971 Term, 86 Harv.L.Rev. 52, 103 (1972):

"One can suppose that the [*Morrissey*] Court valued the public safety, which might be endangered by an unrehabilitated parolee left at liberty, more highly than the *Goldberg* Court valued the preservation of the public fisc from the claims of unqualified welfare recipients."

7. Plurality op. at 265, *see also id.* n. 14.

8. *See* plurality op. at 266.

bilitative goals with the requirements of public safety.

Once we conclude that conditions of the kind imposed on Mrs. Consuelo-Gonzalez are consistent with the goals and practical operation of the federal probation system, they must still withstand Fourth Amendment scrutiny if warrantless searches pursuant to them are to be justified. In this regard, I agree with the plurality that the approach which we have adopted in **Latta v. Fitzharris**, 521 F.2d 246 (9th Cir., 1975), provides a framework for balancing the need for a specific condition in promoting the requirements of the probation system against the possible invasion of privacy which such a condition would entail. See plurality op. at 265–266.

The plurality adds the caveat that the adoption in *Latta* of a Fourth Amendment balancing test "fashioned from the raw material provided by the rules relating to both ordinary and administrative searches" was based on a recognition of the "uniqueness of the relationship between the parole officer and his parolee." Plurality op. at 265. My analysis has attempted to demonstrate that searches by law enforcement officials can often serve the same purposes as those made by probation officers and generally can be carried out more efficiently, thoroughly, safely, and with less damage to the probationer-probation officer relationship. Hence, the constitutional balancing we have discussed should apply equally to searches of probationers by law enforcement personnel.

Applying *Latta*, the plurality concedes that reasonable searches by probation officers of their probationers are not only compatible with the goals of the probation system, but essential to its proper functioning. Plurality op. at 265. Consequently, the plurality finds "equally applicable" to searches by probation officers *Latta's* conclusions "that a parole officer need not have probable cause and that a warrant need not be obtained prior to search." *Id.* at 265. Where there has been a prior judicial determination that searches by law enforcement officers will serve the Act's purposes just as will searches by probation officers, the constitutional balance should weigh in favor of allowing such searches where reasonable.

The plurality and I also disagree as to the result which should emanate from their conclusion that "the condition imposed on Consuelo-Gonzalez literally permits searches which could not possibly serve the ends of probation." Absent a showing that this search was impermissible, or that the defendant had frequently been harassed by unreasonable searches, this would not seem an adequate basis for invalidating an otherwise reasonable search.

The other courts which have considered the constitutionality of searches pursuant to conditions on probation have followed several different, though not unrelated, rationales in upholding them. The most common of these can be categorized as the custody theory, the waiver theory, and the "reasonable expectation of privacy" rationale. While each has some conceptual appeal, each also has its limitations.

The custody theory suggests that since the convicted criminal might have been sent to prison instead of being placed on probation, he is entitled to no more protection under the Fourth Amendment than he would have received had he been imprisoned. Under the stricter version of the custody theory, the probationer may be considered as living in a "prison without walls," subject to the same restrictions on his privacy as any other prisoner.[9] Any departure from these re-

---

9. *Cf.* People v. Hernandez, 229 Cal.App.2d 143, 40 Cal.Rptr. 100, 103–104. This view can be seen in a substantially modified form in decisions holding the Fourth Amendment applicable to searches of probationers or parolees, but finding that the status of the party searched as probationer or parole in itself constitutes a circumstance to be taken into account in determining the reasonableness of a probation or parole officer's warrantless search. *See* Martin v. United States, 183 F.2d 436 (4th Cir. 1950); *cf.* **Latta v. Fitzharris, 521 F.2d 246 (9th Cir., 1975).**

strictions should be viewed as a matter of grace, not one of right.

The validity of the strict custody theory, and its continued usefulness for analyzing questions of the sort presented here, has been questioned. *See* Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). It is true that limitations on the Fourth Amendment interests of probationers inevitably spring from the same genesis as Fourth Amendment restrictions on confined prisoners: in each instance the reduced interest is due to a conviction. Probationers, however, should be considered as having more extensive Fourth Amendment rights because the state interests involved in restricting probationers, although strong, are not as important as the overwhelming need for prison security.[10]

Perhaps to a sentencing judge, the waiver theory would seem to apply. The courts adopting this theory have reasoned that defendants accepting probation with special conditions have consented to searches pursuant thereto. *See, e. g.,* People v. Kern, 264 Cal.App.2d 962, 71 Cal.Rptr. 105, 107 (1968); State v. White, 264 N.C. 600, 142 S.E.2d 153 (1965).

Consent by the defendant, however, is more likely to be nominal than real. A convicted defendant will often accept almost any alternative to imprisonment, although trial judges have encountered some who would prefer confinement to enduring protracted, strictly enforced conditions of probation; *e. g.,* payment of restitution, staying out of debt, support of dependents, and staying sober. *See generally* Note, 8 Ga.L.Rev. 466 (1974).

More important, the waiver theory unduly obscures the fact that it is the district judge, not the convicted felon, who is charged with the responsibility of balancing the need to protect society by his choice of sentence against the rehabilitative goals of the Federal Probation Act. Hence in many jurisdictions the choice of the defendant has been reduced to objecting to the conditions by post-sentence motion, or challenging their application in suppression proceedings at a later trial.

The "reasonable expectation of privacy" approach seems to be the most appealing of the analyses relied on by other courts in upholding search conditions in grants of probation. *See, e. g.,* People v. Mason, 5 Cal.3d at 765–66, 97 Cal. Rptr. at 305, 488 P.2d at 633.

Under this theory, a probationer would have no reasonable expectation of privacy as to those areas and situations which have been made subject to search at any time by the very terms of his or her probation order. This theory would complement the administrative search rationale discussed above and would invite the same type of balancing approach. The more frequent and detailed the intrusions and the more personal the areas of privacy invaded, the greater must be the reasonableness of the search in its relationship to the original crime and to the purposes of the probation system.

A fourth rationale with considerable conceptual appeal for analyzing these cases draws on the Supreme Court's refusal to require a warrant for certain types of administrative searches. *See* United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed. 87 (1972); Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *cf.*

---

10. Indeed, it would seem that there is a hierarchy of state interests in protecting society which vary inversely in their importance with the status of the convict being dealt with, *i. e.,* prisoner, resident of "halfway house," parolee, probationer. To this list might be added the state's interests in restricting the normal freedoms of those adjudged criminally insane, those under court orders of various sorts, those on bail pending trial, etc. Of course, the crime to which the limitations on the individual's freedom originally related will be a vital factor in determining the reasonableness of the conditions imposed, but the current status of the convict will also be a valid criterion for determining the strength of the public protection factor entering into the judge's decision on conditions.

Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). While we know of no decisions relying exclusively on this approach in upholding Fourth Amendment conditions on probation, this court has found these three decisions in the administrative search area "consistent" with our decision to uphold the warrantless search of a parolee by a parole officer in Latta v. Fitzharris, 521 F.2d 246 (9th Cir., 1975).

The common thread between the administrative search cases and the *sui generis* approach approved in *Latta* for considering Fourth Amendment restrictions on parolees seems to lie in the existence of some important public interest justifying adoption of a balancing approach. In this case, conditions allowing law enforcement officers to search serve the vital public interests of promoting the rehabilitative goals of probation while ensuring that adequate heed be paid to public safety. Once we recognize that the "special and unique interest[s]" of probation authorities in having the right to invade the privacy of probationers extend to law enforcement officials, it would follow under both the *Latta* rationale and that of the plurality opinion at 265–266 that such searches must be permissible if conducted reasonably and for legitimate purposes.

The administrative search approach, as refined in *Latta* to deal with criminal offenders, has the advantage of being general enough to encompass the concerns implicit in each of the three approaches to this type of case discussed above. It draws on the public safety rationale underlying the custody theory for much of its initial justification. At the same time, it accommodates an important concern of the consent theory by requiring that the probationer have notice of the condition, and that of the reasonable expectation of privacy approach by injecting the reasonableness of the condition both in its imposition and in its application into the range of judicial considerations.

Regardless of the theory espoused, there is a consistent recognition that parolees and probationers are different from other citizens and that they may, in certain circumstances, possess fewer constitutional rights. This difference stems from the one thing all parolees and probationers have in common: they have been convicted of a crime. It is for this reason that they may be singled out and their constitutional rights restricted where important public interests would be served. Only after they have successfully completed their parole or probation, are they entitled to the constitutional protections granted other citizens generally.

While drawing on the approaches of other courts approving Fourth Amendment conditions on probation, application of *Latta's* balancing approach would avoid the pitfalls of carrying any of them to its logical extreme. In each case, the sentencing court could determine whether the condition is related to the original crime and necessary to promote rehabilitation and protect the public. In addition to this prior judicial determination of reasonableness in the imposition of the condition, the probationer would be able to challenge in later suppression proceedings any unreasonableness in the application of the condition.

The judge's role would extend beyond concern for the offender's privacy to encompass also broader considerations of the important interests, public and private, involved in his determination.

When the trial judge considers the need of the public for protection against recidivism, there will have to be some accommodation in the form of conditions of probation before he will be willing to consider the use of probation at all.[11] Thus, it is both constitutionally permissible and essential as sound sentencing practice for the district judge to take public safety into account by ordering conditions which in any probation situation best balance "the equally desirable

---

11. Some courts have relied directly and principally on a public protection rationale in upholding search conditions on probation. *See*

People v. Chinnici, 51 Misc.2d 570, 273 N.Y. S.2d 538 (Nassau Cty.Ct.1966).

and interacting goals of freedom of action, deterence and rehabilitation." 8 Ga.L.Rev. at 484.

The plurality is correct that some conditions of probation would be so restrictive as to greatly undermine the rehabilitative goals of the Act. By the same token, however, it seems clear that without some reasonable conditions on probation, the trial judge may well determine that public safety will be unduly endangered and instead order commitment.

No showing was made that the condition challenged here has been routinely imposed in cases where it was not reasonably related to the original offense, or that it has been used for purposes of intimidation or harassment. And if any condition should ever be employed in an unjustifiable manner, it would always be open for a probationer to challenge the search as an unreasonable application of a search condition permissible on its face. The plurality's approach, however, would burn the bench to avoid the occasional splinter. I see no reason to absolutely reject reasonable conditions somewhat restrictive of Fourth Amendment liberties when we have not done so in the face of similar First Amendment restrictions.

I do agree, however, that it would have been preferable for the condition to have incorporated some of the limitations on its use which remained implicit in the challenged formulation. Hence, I approve of the form set out in the plurality opinion at 263, but would expand it to also allow for searches by law enforcement officers.

This would accommodate the plurality's concern that the condition expressly provide that any searches pursuant to the condition be reasonable in their execution.[12] It would also do nothing to affect the continuing requirement, consistently imposed by this court, that the condition must have been reasonably related to the crime for which the probationer was convicted [reasonableness in the imposition]. Finally, such a condition seems to me not inconsistent with the plurality's concession that conditions serving public protection or deterrence are not contrary to the purposes of the Act, so long as all the conditions construed together serve substantially the purpose of rehabilitation. Plurality op. at 266–267.

Since I find nothing in the record to indicate either that the condition was not reasonably related to the original crime, or that it was abused by the officers seeking to rely on it, I would affirm.

CHAMBERS, Circuit Judge (dissenting):

The Fourth Amendment proscribes unreasonable searches. For one who is in partial custodia legis, I do not think it is an unreasonable search for an officer to politely go without a warrant and search, so long as there is no evidence of harassment. And, there was none here.

The majority decision will result in more trial judges sending more defendants to prison where they will have very little Fourth Amendment rights.

Unless we belong to the school that believes probation is overdone now, I think the majority's result comes out the wrong way.

I have a little trouble with letting probation officers conduct searches and denying police officers the same right. The probation officer should play the role of being the defendant's pal and not his jailer.

---

**12.** In fact, on subsequent review, evidence that police officers had ascertained the existence of a search condition and had consulted with the suspect's probation officer prior to a challenged search, would be of probative value as to the reasonableness of the search.