# State of Vermont v. George O. Emery, Jr.

[593 A.2d 77]

No. 87-535

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed April 19, 1991

*M. Patricia Zimmerman*, Windsor County Deputy State's Attorney, White River Junction, for Plaintiff-Appellee.

*Bruce M. Lawlor*, Springfield, for Defendant-Appellant.

**Peck, J.** Defendant appeals from a Windsor District Court order concluding that he violated the terms of his probation, after conviction for lewd and lascivious behavior with a minor. We affirm.

Pursuant to a plea agreement, defendant pled nolo contendere to a charge of lewd and lascivious behavior in violation of 13 V.S.A. § 2602. A presentence investigation report was or-

dered, and in December 1985 defendant was sentenced to a term of zero to two years, all suspended except for thirty days, with the balance of the time on probation. Among the conditions in the probation agreement were condition eight, requiring defendant to participate fully in any program to which he might be referred by his probation officer, and condition twenty-two, which required that defendant "actively participate in the Windsor County Sex Offender's Program and complete the same to the full satisfaction of your Probation Officer."

Thereafter, defendant was evaluated by two mental health professionals, who found him unsuitable for outpatient sex-offender treatment and submitted a written report to his probation officer so stating. After a new sex-offender outpatient program was formed in Windsor County in 1986, defendant was screened again, and found suitable for participation in the new program. In order to participate in this program, defendant was required to sign a treatment contract. Defendant testified that, prior to his signing the contract, William Eck, a probation officer, explained "some words . . . that I didn't understand . . . pertaining to this penile machine, and I told him I didn't like that at all." Eck testified that he explained the details of the program to defendant before he signed the treatment contract, including the possible use of the penile plethysmograph. The contract defendant signed included among treatment goals "identifying and changing deviant behavior patterns," with the understanding that "I will be asked to discuss these tasks and assignments in group treatment." Defendant testified that although he felt pressured, he signed the contract for the new program on August 14, 1986, after consultation with his attorney, and thereafter attended three of four orientation meetings beginning on August 21, 1986. Defendant attended none of the actual treatment sessions after the first one.

In September 1986 defendant's attorney advised his probation officer of what the attorney considered to be a suicidal risk for his client if he continued therapy, and the officer scheduled an evaluation with Dr. William LeBlanc at Mary Hitchcock Memorial Hospital to assess any potential suicidal risk. Defendant refused to meet with Dr. LeBlanc, and on October 16, 1986, his probation officer signed a violation-of-probation complaint. Defendant was arraigned on October 21, 1986, and on October 29,

1986, the court ordered an evaluation by Dr. William Cunningham, a psychologist, whose written report was submitted to the court. Dr. Cunningham testified at the probation-violation hearing that defendant objected to the sex-offender treatment program because it was "immoral." He said that defendant characterized his conduct with his stepdaughter as "non-sexual."

Defendant testified that at his first group therapy session he was told he would be required to "rehash the whole incident in front of the group," to fantasize "[a] sexual encounter with a female," and "to masturbate and be hitched up to this penile machine." He stated that according to his religious belief fantasizing and masturbation are wrong.

William Ballantine, a psychologist with experience in dealing with sex offenders, testified for the State that group treatment and behavioral treatment "are considered the two most effective treatments." Mary Jane Edgerton, a mental health consultant experienced in working with sex offenders, corroborated the point:

> Q. The treatment program at West Central that Mr. Emery went to the first meeting—is that primarily group therapy?
>
> A. It is entirely group therapy with some adjunctive individual sessions. The primary modality of treatment is group therapy.
>
> Q. Do you have an opinion as to the preference of group therapy versus individual therapy?
>
> A. Yes, probably two. One, is that the presence of 10 people versus two people is more effective modality for accomplishing very confrontive work. Very difficult work.
>
> Q. That would be a confrontive kind of a modality at that point?
>
> A. ... You have to look at this from the point of view that many people find it difficult to discuss their sexual fantasizing if it's deviant. They're frightened of it. They are ashamed of it ... and it's very helpful to have other people who are committed to the growth and change process to help another person who might be having difficulty. Some people have real poor communication skills. They've lived a lifetime of not discussing themselves. They don't know how

to do it. The power of the group to help them do that is very important. . . .

Dr. Cunningham testified that "I don't think there's anybody in the field that would dispute that group treatment for sex offenders is the treatment of choice."

Based on testimony of psychologists testifying for the State, the trial court found that "[t]he group meetings are confrontive and people obtain support from other group members. Confrontive groups are the best method to reduce recidivism in sexual offenders." The court also found that "[t]he use of a penile plethysmograph and masturbation are not required in the group and the defendant was told these methods were not to be used in the group."

The trial court found that "[t]he main thrust of the defendant's behavior is to avoid treatment and not to preserve a religious belief. Consequently, it is concluded the defendant's religious belief upon which he relies is not sincere. It is just one more argument he utilizes to avoid treatment." Defendant testified that he had sought and obtained counseling help on his own from two counselors in Massachusetts and the pastor of his church. He contended that the alternative treatment he received met the need for rehabilitation and the State therefore had no power to impose a program on him that offended his religious belief. The court rejected the argument that defendant's private counseling arrangements sufficed to relieve him of the obligations of his probation contract, and concluded that defendant was in violation of the December 1985 probation agreement. The present appeal followed.

## I.

■■ Defendant argues first that the revocation of his probation violates his right to religious freedom under the First Amendment to the United States Constitution and Chapter I, Article 3 of the Vermont Constitution. Generally, probation conditions are valid "if . . . reasonably related to the crime for which the defendant was convicted." *State v. Whitchurch*, 155 Vt. 134, 137, 577 A.2d 690, 692 (1990); *State v. Gleason*, 154 Vt. 205, 214, 576 A.2d 1246, 1251 (1990) (probation conditions must reasonably relate to defendant's rehabilitation). In *Whitchurch* we ruled that compliance with the requirements set forth in the

California case *People v. Lent*, 15 Cal. 3d 481, 486, 541 P.2d 545, 548, 124 Cal. Rptr. 905, 908 (1975), and the American Bar Association Standards for Criminal Justice pertaining to probation conditions "will result in probation conditions that meet constitutional and statutory mandates." *Whitchurch*, 155 Vt. at 137, 577 A.2d at 692. Under *Lent*, "a probation condition will be found valid unless: (1) it has no relationship to the crime for which the defendant was convicted; (2) it relates to conduct which is not itself criminal; and (3) it requires or forbids conduct which is not reasonably related to future criminality." *Whitchurch*, 155 Vt. at 137, 577 A.2d at 692 (citing *People v. Lent*, 15 Cal. 3d at 486, 541 P.2d at 548, 124 Cal. Rptr. at 908). The American Bar Association Standards for Criminal Justice state that probation conditions "should not be unduly restrictive of the probationer's liberty or autonomy" and that where fundamental rights are involved, special care should be used to avoid overbroad or vague restrictions. American Bar Association, Standards for Criminal Justice 2d § 18-2.3(e). In *State v. Mace*, 154 Vt. 430, 436, 578 A.2d 104, 108 (1990), we noted, in the context of a freedom of speech challenge, that "[p]robation conditions may impact upon a probationer's First Amendment rights so long as the conditions have a reasonable nexus with rehabilitation of the defendant and protection of the public." (citing *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988)).

We have never yet applied these tests where probation conditions impinge on a probationer's freedom of religion. In *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 265 (9th Cir. 1975), however, the Ninth Circuit analyzed the relationship between the guarantees under the Bill of Rights and a sentencing court's broad power to impose probation conditions. It recognized that "probationers, like parolees and prisoners, properly are subject to limitations from which ordinary persons are free" but reasoned that "these limitations in the aggregate must serve the ends of probation." *Id.* The Ninth Circuit noted that there is no presumption that such limitations are impermissible but concluded that "[c]onditions that unquestionably restrict otherwise inviolable constitutional rights may properly be subject to special scrutiny to determine whether the limitation does in fact serve the dual objectives of rehabilitation and

public safety." *Id.* With these principles in mind we turn to the case on hand.*

■ The disputed probation conditions satisfy the *Whitchurch* test. The requirement that defendant participate in a sex offender's group is clearly related to defendant's crime of lewd and lascivious behavior. See *State v. Peck*, 149 Vt. 617, 623, 547 A.2d 1329, 1333 (1988) ("[c]ompletion of counseling in a sex offender's group is reasonably related to the crime of simple assault when the assault was of a sexual nature"). Moreover, since the object of group therapy is preventing recidivism, the conditions require conduct which is reasonably related to future criminality. See *id.* ("participation in sex offender's counseling may serve to protect the public against similar misconduct in the future"). Finally, the conditions are related to defendant's criminal aberrant sexual behavior. Accordingly, the conditions satisfy the three prongs of *Lent.*

We are satisfied that the conditions are not overly restrictive of defendant's liberty and autonomy nor are they overly broad or vague. Defendant claims that he should be permitted to continue counseling with his pastor in place of participating in a sex offender's program. The trial court specifically found that "[t]he use of marital-type therapy and general-type therapy of the defendant's choice broadens his responsibilities and allows him to avoid facing responsibility for his specific offense, and with dealing specifically with it." There was substantial evidence to support this finding in the record. Thus, the alternative proposed by defendant would not adequately protect the public against similar misconduct in the future.

---

* We note that this case involves facially neutral conditions having only an incidental impact on defendant's religious freedom. Conditions which are themselves religious directly requiring or prohibiting religious conduct may require analysis under traditional freedom of religion standards. See *State v. Evans*, 14 Kan. App. 2d 591, 593, 796 P.2d 178, 180 (1990) (probation condition requiring that defendant attend a specific church and perform one thousand hours of maintenance work at that church invalid where not justified by a compelling state interest); see also *Jones v. Commonwealth*, 185 Va. 335, 343–45, 38 S.E.2d 444, 448–49 (1946) (probation condition requiring that juveniles attend Sunday school and church for one year invalid as a violation of the juveniles' freedom of religion).

 Moreover, the court found that participation in group therapy is the best method of reducing recidivism in sexual offenders. This conclusion was amply supported. While some evidence was presented that the state is studying the formation of alternative group therapy programs, no such program has been approved and little information was presented about the likely success of such a program. Thus, the Windsor County sex-offender program was the only available option. The reduction of recidivism directly serves the dual objectives of rehabilitation and public safety. Accordingly, despite the alleged impact of the program on defendant's federal and state constitutional rights to religious freedom, the probation condition was valid under *Mace* and *Consuelo-Gonzalez*.

## II.

Defendant next argues that he was denied his Sixth Amendment right of confrontation because the trial court allowed two witnesses to recount hearsay statements made by Paul Stewart of the Windsor County sex offender's group. The court admitted the statements pursuant to V.R.E. 1101, which states that the rules of evidence other than those relating to privileges do not apply to probation revocation hearings except as provided by statute or rule promulgated by the Supreme Court.

 The contested hearsay was cumulative. We need not decide whether error occurred since we are convinced that introduction of the evidence did not have the slightest effect in this case and was therefore harmless. See *State v. Hunt*, 150 Vt. 483, 494, 555 A.2d 369, 376 (1988) (where a gun improperly introduced was cumulative evidence introduction was harmless). The objectionable testimony recounted Dr. Stewart's conclusion that defendant denied responsibility for his offense. This conclusion, however, was incorporated into a medical report by Dr. Ballantine and Dr. Stewart that was admitted into evidence without objection. Moreover, Dr. Ballantine, Mr. Eck and Ms. Edgerton all testified based on their own individual examinations of defendant that he minimizes his responsibility for the offense. Accordingly, the introduction of Dr. Stewart's conclusion through hearsay cannot serve as a basis for overturning the lower court's order.

## III.

Finally, defendant contends that certain of the trial court's findings were clearly erroneous: first, that part of Finding 3 stating that "[t]he defendant understood these [probation] conditions were agreements that he was to follow," and second, Finding 12, which states that "[t]he use of a penile plethesmograph [sic] and masturbation are not required in the group and the defendant was told these methods were not to be used in the group." Defendant's contention is twofold: first, that the plethysmograph and masturbatory techniques were in fact part of the program to which he was assigned, and second, that he had not been informed about these conditions when he signed the probation agreement, only learning of the objectionable requirements during the first group session.

In *State v. Peck*, 149 Vt. at 619, 547 A.2d at 1331, we stated that "due process requires that a convicted offender be given fair notice as to what acts may constitute a violation of his probation, thereby subjecting him to loss of liberty." Defendant is correct that there was considerable evidence on the record supporting his contention that he had been concerned the plethysmograph and masturbation might be used in the program. The testimony of both Mr. Eck and Ms. Edgerton support this contention. But we disagree that defendant was not given adequate notice of what the treatment program for sex offenders would entail. It is important to distinguish the initial probation agreement, which was signed as part of defendant's sentencing on December 27, 1985, and the agreement to enter the Windsor County program, which was undertaken on August 13, 1986. Defendant knew when he executed the initial probation agreement that he would be compelled to participate in some rehabilitation program. It was clear that the specifics of the program would be determined at a later time, since no specific program was recited in the agreement and no specific course of treatment identified. After extensive evaluations were subsequently conducted, defendant was not found suitable for programs existing before the Windsor County sex-offender program was initiated. Defendant was, however, found suitable for this new program. Mr. Eck testified that he explained the details of the program to defendant before he agreed to sign the

treatment contract. On cross-examination, Mr. Eck stated that he supplemented the written agreement, which was nonspecific, with specific information about masturbation and the penile plethysmograph.

Consequently, defendant received a general warning from the text of his probation agreement that he would be required to complete any rehabilitation program chosen by his probation officer, which agreement was not to be treated as "a strait-jacket that defies common sense." *State v. Duffy*, 151 Vt. 473, 478, 562 A.2d 1036, 1039 (1989). Prior to signing the contract for the Windsor County program, he received more specific information. This is similar to the timing and the contents of notices received by the defendant in *Peck*, 149 Vt. at 620, 547 A.2d at 1331, and more than suffices as due warning to defendant of what was required of him as a probationer. The fact that he protested prior to signing the contract for the Windsor County program buttresses the conclusion that he was then aware of its objectionable aspects. As late as August 13, 1986, he could have refused to sign the agreement on the basis that it was inconsistent with his original probation agreement. The full facts reflect greater particularity in the Windsor County program contract, but no inconsistency with the probation agreement.

Defendant also attacks the trial court's conclusion in Finding 12 that defendant was told that the objectionable techniques would not be used. Finding 12 is not supported by the Eck and Edgerton testimonies, and we therefore conclude that this finding is erroneous. The other findings and evidence make it clear, however, that defendant was told of the possibility of the use of penile techniques before signing the August 1986 treatment agreement and that he later chose to abandon the prescribed treatment program. Therefore, the error in Finding 12 is harmless and does not taint the court's conclusion that defendant violated a probation agreement undertaken with full knowledge of the objectionable treatment possibilities.

Defendant additionally attacks the court's findings negating the importance of defendant's assertions that his concern over the use of the plethysmograph and masturbatory techniques rendered him suicidal, and specifically finding that

"the defendant used the suicidal talk to avoid treatment." Defendant is correct that no witness testified that the talk of suicide was a deliberate ruse to avoid treatment. There was, however, ample testimony that defendant had difficulty accepting authority, and in the context of the complete findings, the court could decline to accept defendant's position that he was concerned over suicidal tendencies and conclude, on the record as a whole, that his principal motivation was to avoid treatment.

*Affirmed.*