**UNITED STATES of America**

v.

**James GIANNETTA.**

**Crim. Nos. 86–00035–P–01, 86–00063–B–04.**

United States District Court, D. Maine.

April 14, 1989.

See also 695 F.Supp. 1254.

William H. Browder, Jr., Asst. U.S. Atty., Portland, Me., for U.S.

Judy Potter, University of Maine Law School, Portland, Me., for James Giannetta.

---

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

Defendant in this action pled guilty on December 5, 1986, and March 12, 1987, to charges of conspiracy to possess with intent to distribute approximately two kilograms of cocaine and to import into the United States approximately 8000 pounds of hashish in violation of 21 U.S.C. §§ 841(a)(1), 846, 952(a), 960(a)(1), (b)(2), and 963 and 18 U.S.C. § 2. On February 26, 1988, this Court suspended the imposition of sentence and placed Defendant on probation for a period of five years

> Upon the usual terms and conditions of probation and upon the following special condition: (1) that the Defendant shall, at all times during his period of probation, readily submit to a search of his residence and of any other premises under his dominion and control, by his supervising probation officer, upon the officer's request.

Judgment, Docket Item 18 (February 29, 1988). After the sentencing, Defendant's Probation Officer, Vincent Frost, provided Defendant with a copy of the conditions of probation and explained each one to him.

Within a few weeks, Probation Officer Frost became somewhat suspicious of Defendant for several reasons. First, a disclosure of assets listed numerous vehicles and a boat although it had been represented at sentencing that Defendant had no assets with which to pay a fine.[1] In the course of surveilling Defendant's house, as part of his mandated supervision of Defendant, Frost also noted and investigated a brand new BMW automobile. He learned that Defendant had been heavily involved in its purchase by his unemployed roommate, Peter Boucher, and that Defendant's father had loaned Boucher the money for the car. On March 25, 1988, Probation Officer Frost received information from South Portland Police Detective Reed Barker that an almost identical BMW, registered to Boucher's grandfather but driven primarily by Boucher, had been reported stolen in Westbrook. Barker suspected that the claim had been false and, having learned that Defendant was Boucher's roommate, sought information from Frost. Subsequently, Barker informed Frost that Defendant's Corvette had been stolen and found stripped and that Defendant had collected the insurance and then bought the salvage rights to the car. Probation Officer Frost said he and Barker had become suspicious of some sort of fraudulent insurance scheme when they figured out that Boucher had bought a brand new BMW identical to one that he regularly used shortly before the latter car was stolen and then found stripped. Frost testified that the information on the Corvette just pointed to a possible scheme

---

1. The Court here sets forth the pattern of events which led to Probation Officer Frost's reasonable belief that Defendant was violating his probation and which necessitated the search under the conditions of probation. Defendant has argued and has tried to prove that various of Frost's suspicions concerning Defendant's behavior were unfounded or that Frost could have determined that suspicious events were innocuous through other means of investigation. The Court has considered all of Defendant's arguments and finds no need to discuss each one individually. Part of Frost's job was to be suspicious in the interest of supervision—and he was to use his judgment and knowledge of Defendant in evaluating the suspicions and deciding how to investigate them. When the record shows, as it does here, a pattern of events giving rise to a reasonable suspicion that Defendant was violating the conditions of his probation and that the probation officer acted reasonably in his investigation, the Court will not examine closely and try to second-guess the officer on his evaluation of any of the underlying occurrences.

to either own the car or have a friend own a car and then have the car reported stolen and, in the meantime you strip all of the major articles off that car and dump the car and then collect the insurance.... And then you claim salvage, which you would only have to pay sometimes less than a thousand dollars for salvage rights to the car. You get the car back and then put the parts back on it and reconstruct the car.

Suppression Hearing Tr. at 45. Later Barker reported to Frost that he had spotted what he thought was a stripped car under a tarp on a car carrier in front of Defendant's house and that there had been a theft of four wheels from the BMW that Boucher had bought with Defendant's involvement at Classic Olds.

Barker also informed Frost in March that security officers at Filene's, a retail department store in Newington, New Hampshire, thought that Defendant might be involved in some sort of fraudulent scheme concerning the purchase and return of merchandise. Frost went to New Hampshire in May, and Filene's personnel identified Defendant from a photo spread as having been in the store. Defendant had not received permission to go to New Hampshire, so his presence there would be a violation of the conditions of his probation.[2] *See* Exhibit 3, Condition 2.

In the course of his surveillance of Defendant, Probation Officer Frost also noticed Boucher and two others entering a Pontiac Fiero which he had not seen before. Investigation showed that it had been purchased from a dealership in Concord, New Hampshire, and that Defendant had been at the dealership twice in April, again without permission, and had cosigned a car loan application. In examining the loan application, Frost noted that Defendant had represented himself as the owner of Leisure Leasing in Canton, Massachusetts, with an annual salary of $75,000. Although Defendant had indicated to Mr. Frost that he hoped to go into the car rental business, he had not reported such a job or any such salary in any of his monthly probation reports, and he had not filed a 1987 income tax return because he had not had a job or an income. Frost reasonably suspected, therefore, that Defendant had made a fraudulent loan application.

Probation Officer Frost testified that in May 1988, after Frost had told Defendant he needed a court order to travel to Massachusetts, Defendant leaned over closer to him and whispered, "Why don't you close the door of your office and tell me what I have to do." Frost interpreted Defendant's statement as an attempted bribe.

Probation Officer Frost also determined through telephone toll records and prison telephone recordings that Defendant had talked several times without permission to his codefendant, Biagio Barone, who was imprisoned at FCI Loretto. Probation Condition 10 provides that Defendant shall not associate with any person convicted of a felony unless granted permission to do so by a probation officer, and no permission had been given for such communications.

On June 13, 1988, during a surveillance, Probation Officer Frost noticed Defendant driving a Jeep Cherokee. Defendant's license had previously been suspended, so he was committing a crime by driving, in violation of probation condition 1. Frost reported the incident to the Falmouth Police and an arrest warrant was issued for Defendant.

In mid-June, Probation Officer Frost also learned from Robert Reno, a defendant in this court and a Government witness, that he had seen Defendant in Florida in March and that Defendant always carried a gun. Defendant had not received permission to travel to Florida in March, and possession of a firearm by a felon is a violation of the law.

On June 30, 1988, in possession of all this information, Probation Officer Frost went

---

**2.** Frost knew from Detective James Langella, but not from Defendant, that Langella had questioned Defendant in March and May 1988, with one meeting having been initiated by Defendant. Conditions 12 and 13 require that Defendant inform his probation officer if he is questioned by police and forbid him to enter into cooperation agreements without the Court's permission.

to Defendant's house with South Portland police officer Reed Barker and conducted a two- to three-hour search. In the course of the search, Frost seized a large number of items, including documents, checks, cash cards, and computer materials. After reviewing the materials seized, on August 24, Probation Officer Frost sought and obtained an arrest warrant for Defendant for alleged probation violations. Federal marshals executed the warrant on September 2, 1988, at which time Probation Officer Frost conducted another search under the special condition of probation and seized more material. The Government now seeks to revoke Defendant's probation.

Defendant has moved to suppress the items seized during the two searches of his house to prevent their use at the probation revocation hearing. He argues that the searches and seizures violate the Fourth Amendment of the United States Constitution, the Federal Sentencing Guidelines,[3] and 18 U.S.C. § 3603, which specifies the duties of probation officers.

### The Searches

■ Defendant's first argument is that the searches by Probation Officer Frost violated the Fourth Amendment. In *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Supreme Court explained Fourth Amendment requirements as they pertain to probationers subject to search under a Wisconsin probation regulation. The Court stated that a probationer's home is protected by the requirement that any searches be reasonable. *Id.* 483 U.S. at 873, 107 S.Ct. at 3167, at 717. Extrapolating from and quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972), which had addressed the issue of parolees' rights, the Court pointed out that "probationers do not enjoy 'the absolute liberty to which

every citizen is entitled, but only conditional liberty dependent on observance of special [probation] restrictions.'" *Griffin*, 483 U.S. at 874, 107 S.Ct. at 3168, 97 L.Ed.2d at 718. Probation restrictions serve to insure that the probation period is one of genuine rehabilitation and that the community is not harmed by the probationer being at large. Supervision by probation officers is essential to see that the restrictions are observed. Probation supervision is, therefore, a special need of the state[4] necessitating a degree of infringement of privacy rights which would not be constitutional if it were directed at the public at large. *Id.* The Supreme Court made clear, however, that the degree to which probationers' rights may be diminished is not unlimited. *Id.*

In *Griffin*, defendants had challenged a search conducted under Wisconsin's probation regulations, which permit a search of a probationer's house without a warrant as long as there are reasonable grounds to believe there are items therein which the probationer may not properly possess. The Supreme Court held that the special needs of Wisconsin's probation system, including the need for expedition in searches, the need to maintain a deterrent effect for the supervisory arrangement, and the need for close, nonadversarial monitoring of probationer behavior, justified the regulation. Therefore, a search conducted under the regulation and meeting its requirements is reasonable and requires neither a warrant nor probable cause. *Id.* 483 U.S. at 876–77, 107 S.Ct. at 3169–70, at 719–20.

Although the federal probation system does not have a regulation similar to that in Wisconsin, *Griffin*'s analysis can be extended to allow the reasonableness of searches to be determined by the findings of the sentencing court embodied in special

---

**3.** The Federal Sentencing Guidelines do not apply to this case since the crimes for which Defendant was sentenced took place before the effective date of the Guidelines, November 1, 1987. *See United States v. Twomey*, 845 F.2d 1132, 1135 (1st Cir.1988).

**4.** The special needs analysis employed by the Court, which permits warrantless searches in

certain types of cases on less than probable cause, parallels that used in the administrative and school search contexts. *See Griffin v. Wisconsin*, 483 U.S. at 873, 107 S.Ct. at 3167, 97 L.Ed.2d at 717 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), and *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

conditions of probation.[5] *United States v. Schoenrock*, 868 F.2d 289 (8th Cir.1989). In examining the special needs of the federal probation system with regard to the Defendant sentenced here, it is clear at the outset that the special needs of the Wisconsin probation system pertain to the federal probation system as well. In this particular case, however, a special search condition was even more justified and, in fact, was deemed crucial both to the rehabilitation of Defendant and to the protection of the public.[6]

Defendant had been involved in major drug dealing for a period of time and his associates, from various segments of the organized crime community, were described by Defendant as "seriously dangerous criminals." Sentencing Tr. at 36. When asked by the Court at sentencing why he had gotten involved in criminal activity, Defendant explained that he was very tempted by the excitement attendant to his criminal life style. He expressed relief at his arrest as an avenue for leaving that life behind:

> And I realized that the way I lived my life was walking a very fine line. I knew from the boat races, the excitement of the whole thing, it was just too much for someone who enjoyed life and I knew that there was no possible way that I could ever go back if I had burned every bridge that was behind me.

*Id.* at 39.

The Court was very concerned that Defendant would go back into crime because of the excitement it held for him. *Id.* at 43.

That this need for excitement is a component of his personality was gleaned not just from Defendant's allocution but from his counsel's description of the way Defendant undertook undercover work for the Government:

> When you hear a little about Jim, you will find not only is he an incredibly hard working person but he has a flare when he works on the edge to take chances that no government agent is ever going to do ... He is that kind of person, smart enough, intelligent enough and literally crazy enough to put himself in their position.

*Id.* at 27–28.

That a person with this personality trait who has been involved so heavily in such serious crime needs extraordinary supervision to keep him from reverting to his prior life was recognized not only by the Court, *id.* at 44, by the Government, *id.* at 59, and by two of Defendant's three attorneys, *id.* at 29, 61, but by the Defendant himself as well. *Id.* at 45. The Court explained to Defendant that any sentence of probation would have such stringent requirements that Probation Officer Frost "will be walking right behind you if not in your hip pocket." *Id.* at 44. Defendant replied: "I fully understand. Maybe I need a little more control in my life and that would be something I would need and it may be beneficial to the outcome." *Id.* at 45.

In the context of this probationary sentence, therefore, where large quantities of drugs were involved and Defendant admittedly was in need of stringent supervision,

---

**5.** Defendant argues that the search violated the boundaries set by the conditions of probation imposed upon him. He points specifically to Condition 11, which provides: "You shall permit the Probation Officer to visit at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the Probation Officer." Exhibit 3 at 1. Defendant asserts, and the Court agrees, that Probation Officer Frost did not conduct that sort of plain view search for contraband. Condition 11, however, was not the operative condition in this case. It falls within the general conditions of probation which are applicable to all probationers in this district. In this case, since more supervision was required, the Court had imposed a more stringent special condition which was both recited by the Court at the sentencing

hearing and memorialized on page 2 of the Probations Conditions provided to Defendant. It was clear at the time of sentencing that the special condition was in addition to the normal conditions, Sentencing Tr. at 63, not governed by them, and this would have been made clear to Defendant by Probation Officer Frost, who testified that he explained each probation condition individually to Defendant. Suppression Hearing Tr. at 28–29.

**6.** Only very rarely has the Court felt it necessary to impose such a drastic condition to effectuate the purposes of probation, and it had never done so prior to the sentencing of this Defendant.

a condition subjecting the probationer to searches by his probation officer was not only permissible but perhaps essential if the rehabilitation and protective purposes of probation were to be achieved. *See United States v. Consuelo–Gonzalez,* 521 F.2d 259, 265 (9th Cir.1975); *United States v. Schoenrock,* 868 F.2d 289. In *Consuelo–Gonzalez,*[7] an opinion that went on to substantially foreshadow the Supreme Court's recent opinion in *Griffin,* the court explained that searches conducted by a probation officer need not be based on probable cause but must be based at least on a reasonable belief that the search is necessary to perform his duties properly. *Consuelo–Gonzalez,* 521 F.2d at 266. The search must also meet the Fourth Amendment's requirements that it be conducted at a reasonable time and in a reasonable manner. *Id.* at 263.

The condition imposed by this Court did not expressly require that a probation search conducted under it be based on a reasonable belief.[8] Such a requirement was intended by the Court,[9] however, and the fact that it was implicit in the condition was made known to Defendant at the sentencing proceeding. The Court admonished Defendant to treat his probation officer like a father. "When he says he wants something from you or requires something from you, he has a reason for it." Sentenc-

ing Tr. at 64. Moreover, Probation Officer Frost plainly understood the condition to require reasonable cause. He did not conduct the first search until June 30, 1988, when he had good information both that Defendant had apparently violated the conditions of probation on several occasions and that Defendant might be involved in ongoing crimes in further violation of the conditions of his probation. Based on the information that he had received since Defendant's sentencing, Frost decided to search Defendant's house. He stated:

> I think that in my mind at that time I was convinced that Mr. Giannetta had violated the conditions of his probation. I was also convinced in my mind that based on the testimony,—not the testimony, but the information related to me by Robert Reno, that I was going to find a gun there, and I was also hoping that I might find documents pertaining to the insurance scam that we suspected that he was operating.

*Id.* at 85. Given what appeared to be an ongoing pattern by Defendant of cavalier disregard for the terms of his probation, Probation Officer Frost plainly had a reasonable belief that a thorough search of Defendant's home was necessary for Frost to perform his supervisory function properly.[10] *See Consuelo–Gonzalez,* 521 F.2d at

7. In *United States v. Consuelo–Gonzalez,* 521 F.2d 259, the Court found that a search condition requiring defendant to submit to searches upon request by a law enforcement officer was improper because, in permitting nonprobation officers to search, the condition did not serve the ends of probation.

8. In a case subsequent to *Consuelo–Gonzalez,* the Court of Appeals for the Ninth Circuit found a condition similar to the one in this case overbroad, but upheld a search conducted under it when it was based on reasonable cause and met the other Fourth Amendment requirements that it be conducted at a reasonable time and in a reasonable manner. *United States v. Jeffers,* 573 F.2d 1074, 1075 (9th Cir.1978). Similarly, in a recent case, citing *Griffin,* the same court approved a urine test of a probationer without a condition expressly allowing it, when it was based on the probation officer's reasonable belief that it was necessary to determine if probationer was violating a condition of probation forbidding him to violate any federal law. *United States v. Duff,* 831 F.2d 176, 178–79 (9th

Cir.1987). Since the broad authority provided by the specific condition in this case was narrowly and properly exercised, *see infra,* the search would be reasonable and valid even if the condition were too broad.

9. The Court intended and knew from its working relationship with Mr. Frost that he would act under the condition only with good reason. In the extreme circumstances of this case, however, the Court firmly believes that even random searches would have been permissible as a reasonable means of conducting the closest possible supervision of Defendant and of providing the greatest possible deterrent to him if he were considering reentering the world of crime.

10. The court in *Consuelo–Gonzalez* permitted the probation officer's reasonable belief to be based on a "hunch." *Consuelo–Gonzalez,* 521 F.2d at 266. This Court does not find that formulation helpful. It is clear, however, that in this case Probation Officer Frost's reasonable belief was based on reasonable inferences to be drawn from what he had learned about Defendant's conduct.

266; *see also United States ex rel. Santos v. New York State Board of Parole*, 441 F.2d 1216, 1218 (2d Cir.1971) ("parole officer must have reasonable grounds for investigation as to whether the defendant ... was violating his parole," and the search must be "a proper incident of that investigation.").

The record also demonstrates that the search was conducted at a reasonable time and in a reasonable manner. It was begun in the early evening while it was still light, and Frost, noting that Defendant and his friends were about to depart, approached before they could leave so Defendant would have notice and could be present.

Defendant argues that the scope of the search was unreasonable, resembling the colonial general warrant to which the original Fourth Amendment protections were addressed. Probation Officer Frost described the search as follows:

> I conducted the search ... by trying to go through everything that was in the house. I looked under beds, looked under mattresses, checked clothing, checked pockets in clothing, put my hands in shoes and boots, ... checked the bathrooms and then ... the last place that I checked on the second floor was the computer alcove where I spent a great deal of time.

Suppression Hearing Tr. at 81–82. Frost went on to describe his search and seizure of large quantities of material from file cabinets and boxes in the computer area.

Although the search conducted by Frost was very broad in scope, the Court finds that it was reasonable under the circumstances of this case. Frost had specifically warned Defendant that he would be watching for any sign that Defendant was again involved in drug dealing. At the time he conducted the search, Frost was confronted with what appeared to be a pattern of wide-ranging disregard for the conditions of probation imposed by the Court. Moreover, Frost knew that Defendant had been in touch with Biagio Barone, a codefendant in the major drug offenses for which Defendant stands convicted. Frost therefore had reasonable grounds to search for drugs when he was searching for evidence of probation violations. Because drugs, as contraband, are often concealed by their possessors, a reasonable search for them would necessarily include all places and containers in which they might be hidden. *See Consuelo–Gonzalez*, 521 F.2d at 266 (approving "thorough" search of probationer's house on reasonable belief). Similarly, weapons possessed by a felon might be concealed, so a search under mattresses is not unreasonable. Frost testified that one object of his search was documents that would verify his reasonable suspicions that Defendant was involved in a fraudulent automobile insurance scheme. A search for documents necessarily would encompass documents wherever found, whether in file cabinets, boxes, folders, and, in this era, computer disks. As the Supreme Court recognized in *Harris v. United States*, 331 U.S. 145, 152, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399 (1947) (overruled on other grounds in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)), a meticulous investigation is appropriate in a search for items like canceled checks although it would not be considered reasonable if agents are seeking larger items like a stolen automobile or an illegal still. *See also, United States v. Ross*, 456 U.S. 798, 821, 102 S.Ct. 2157, 2171, 72 L.Ed. 2d 572 (1982) (search into closets, desks, boxes and other containers within the authority of the warrant if some item to be searched for under the warrant could be concealed therein). The scope of the search in this case was, therefore, reasonable given the Court's mandate to Frost to monitor Defendant closely and the existence of reasonable cause to believe that specific probation violations were occurring which necessitated an exhaustive and thorough search.

### Seizures

■ Defendant also argues that the seizures made during the search of his home were much too broad and undiscriminating and that the retention of the articles for over seven weeks to determine whether he had violated his probation was unreasonable. Defendant asserts that "[i]n this

case the police officers and the probation officer seized all the business and personal documents, papers and records of James Giannetta, his apartment mate and/or other persons they could get their hands on without regard to the types of documents and records seized and the location in which the documents and records were found." Defendant's Memorandum at 27. The record does not support this assertion. Exhibit 9A indicates that many items, a large number of them documents, were seized during the two searches. Frost stated specifically, however, that he exercised his discretion when seizing items:

> I was going through a lot of stuff and the only things that I seized were what I considered to be contraband, which I thought that were either the products of crimes or, you know, things of that sort. There were, for instance, computer disks that I did not seize on that occasion. There were various papers and many, many files in his file cabinet which I did not seize.

Suppression Hearing Tr. at 84.

As discussed previously, Frost's search for documents pertaining to insurance fraud was reasonable at its inception. He testified that the scope of his search changed dramatically when, on June 30, having discovered checkbooks for many different individuals in Defendant's office area, he "became aware that there appeared to be a perpetration of a bank fraud." *Id.* at 172. He then included anything that might pertain to that particular crime within the scope of the search. *Id.* The checkbooks indicating the bank fraud were in plain view [11] during the course of Frost's search for documents. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Defendant has argued, based on the recent case of *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), that Probation Officer Frost needed probable cause to seize items that were found in plain view in the course of the search. The Court cannot agree.[12] For the same reasons given in *Griffin* for relaxing the probable cause requirement for searches of probationers' homes, a lesser standard should be applied to seizures. The probationer/probation officer relationship is a supervisory arrangement. The deterrent effect of that arrangement, particularly with regard to the commission of fraudulent financial schemes such as those suspected here, could be greatly reduced if the probation officer had to have probable cause to investigate thoroughly. *See Griffin v. Wisconsin*, 483 U.S. at 878, 107 S.Ct. at 3170, 97 L.Ed.2d at 720. Similarly, the officer's ability to intervene before a probationer reverts to criminal behavior and damages society militates in favor of "a lesser degree of certainty than the Fourth Amendment would otherwise require." *Id.* 483 U.S. at 879, 107 S.Ct. at 3171, 97 L.Ed.2d at 721.

Defendant does not make specific arguments that Probation Officer Frost lacked a reasonable belief to seize particular items, but instead suggests that the mere breadth of the seizures, particularly the document seizures, makes them unreasonable. The Court, however, has no basis for so finding. Frost testified at the hearing that he sorted through the materials in the house, taking only those he thought were contraband or evidence of the crimes he thought Defendant was committing. As stated previously, Frost had a reasonable belief that Defendant was involved in an automobile insurance fraud and it was reasonable to believe that there would be a

---

11. Defendant asserts that Frost admitted many of the items seized were not in plain view. They were not in plain view in the sense that they were lying exposed. They came into plain view, however, when Frost was conducting a justifiable search for documents.

12. The *Hicks* Court stated that in certain instances a seizure could be justified on less than probable cause and gave examples of cases in

which there are special operational necessities rendering the seizure the only practicable means of detecting certain types of crimes. *See Arizona v. Hicks*, 480 U.S. at 327, 107 S.Ct. at 1154. As discussed previously and reiterated here, search and seizure in a probationary context is like an administrative search. Both require a lesser standard because of the special needs of the particular situation.

documentary trail. The Court is also persuaded that Frost was justified in believing that Defendant was involved in some sort of bank fraud when he found a large number of checkbooks and bank statements in the names of persons other than Defendant and his roommate. As Frost stated, he considered the items to be ones Defendant had no right to possess. Frost's belief was even more reasonable because at the beginning of his search, he had found what appeared to be a false identification card in the upstairs toilet. Review of Exhibit 9A and the exhibits admitted at Defendant's bail hearing demonstrate that a large number of the items seized, without further explanation, would reasonably have been believed to be evidence of these offenses or to be contraband in the sense described by Frost.

At the hearing, defense counsel asked Frost whether it is true that he seized vehicle documents showing the purchase of a vehicle in Frank Giannetta's name, a legal case file and medical file regarding Peter Boucher, Internal Revenue Service information in the name of Joe Parati, and an estate file for a John Potter. Similarly, defense counsel ascertained that Frost seized photographs, blueprints, diskettes labeled "games," keys, X-rated videotapes, desk calendars, and diaries. No inquiry was made, however, concerning why any of these items were seized. Counsel did not pursue the questioning in an attempt to show that these seizures were not based on a reasonable belief.

To the extent that certain of these seizures were explained on the record, the Court is satisfied that Frost did have a

reasonable belief for them. For example, while some of the vehicle documents were in the name of Frank Giannetta, in Frost's opinion, they were not signed by Frank Giannetta but by Defendant. Frost then had a reasonable belief that these were evidence of one of the fraudulent schemes he was investigating. Suppression Hearing Tr. at 162. Also, one of the desk calendars seized contained a reference to "taking BDS wheels," and Frost knew from Detective Barker that the wheels from Boucher's BMW had been reported stolen. *Id.* at 127. Frost clearly had a reasonable belief that the calendar might be evidence of the fraudulent scheme.

Given Frost's description of his well-defined purpose and method, and the self-evident reasons for many of the seizures in light of these, the Court feels confident in finding that Frost had a reasonable belief in all the instances. Defendant did not elicit any evidence which would undercut the conclusions drawn.[13] Based on the record before it, including both the testimony and the items seized, the Court is satisfied that Probation Officer Frost was properly searching for proof of violations of Defendant's probation, and that he exercised his discretion in that regard to seize only items that he reasonably believed to be either contraband or evidence of such violations.[14]

■ Finally, Defendant argues that the June 30 seizures were unreasonable because of the long delay between the seizure and decision to arrest Defendant for probation violations. As Probation Officer Frost described the sequence of events, he con-

---

**13.** Counsel asked Frost about the seizure of various unmarked keys. Although he did not have a reasonable belief as a basis for their seizure, the record indicates that they were seized inadvertently and found later in the bottom of boxes of documents. The fact of one understandably inadvertent seizure does not render the other seizures unreasonable or indicate a pattern of overbreadth of the search and seizure.

**14.** At the inception of the June 30 search, Probation Officer Frost had reasonable cause to be concerned about several different types of probation violations, including some that might have a documentary trail. As he described, in the course of searching for those documents he

uncovered what reasonably appeared to him to be evidence of bank fraud committed by Defendant. Subsequent seizures related also to that possible probation violation. The search on September 2, 1988 had Frost's initial reasonable beliefs as a basis plus new indications developed since the first search. For example, Frost had investigated the Rolex watches seized and developed reasonable belief to search for further evidence of a fraudulent scheme involving their purchase. Examination of the first seized materials gave a strong basis to search for more evidence of Defendant's fraudulent activities in violation of his probation.

ducted the search on the evening of June 30 and spent all day July 1 going through the materials seized. Suppression Hearing Tr. at 91. He called the FBI that day to tell them what he had found and they did not seem to want to get involved at that point. *Id.* at 93. Frost wanted to involve the FBI because he did not know how to continue the investigation into the materials he had seized. *Id.* at 92. He also called Detective Barker to verify a date for the theft of Boucher's BMW wheels to see if it corresponded to the date on which Mr. Giannetta's desk calendar referred to taking BDS wheels. *Id.* at 127. On July 2, 1988, Frost went on vacation for three weeks. When he returned he began to sift through all the evidence, again notified the FBI of the materials, and, after consultation with the Administrative Office in Washington, decided to turn some of the materials over to the FBI by getting a court order to do so. Probation Officer Frost sought, and received on August 24, 1988, a warrant to arrest Defendant on or after September 1, 1988, for probation violations.

In the criminal context, this Court has found that certain detentions of seized material to develop probable cause are unreasonable when an initial seizure has been lawfully made on a reasonable suspicion. *See United States v. LaFrance,* 702 F.Supp. 350 (D.Me.1988). The probation revocation context is, however, somewhat different because of the supervisory nature of the relationship and the obligation of the probation officer both to aid the probationer and to protect society. If, as Defendant suggests, the reasonableness of the detention here should be determined by applying the test used when seizures are made by police officers on less than probable cause, it is necessary to consider the diligence of the seizing officer in developing probable cause, the duration of the detention, and the information provided to the person

from whom the materials were seized. *Id.* at 354.

In this case, the bulk of the materials seized were suspicious documents requiring a fair amount of time to match against each other and against other information Frost then had. When the search was completed late on the evening of June 30, it was not unreasonable for Frost to defer until the next morning his examination of the materials. On July 1, Frost went through them and pursued his verification of the materiality of the documents as evidence.

Again, both the motion and the record are devoid of any *particularized* allegations that the detention of the materials seized by Probation Officer Frost was too long, or that he lacked probable cause to detain specific items. The record does make clear that Frost, after even a cursory examination on June 30, would have had probable cause to retain many of the documents seized as evidence of probation violations. For example, the materials seized contained numerous checks, new account information, bank cards and bank statements, in different names and for different accounts at different banks. They also contained handwritten notes on bank accounts, a folder labeled "IDS" containing various documents with names, addresses and dates, and an envelope containing various forms of blank birth certificates and blank identification cards. Bail Hearing Tr. at 36–39. Obviously, Frost knew he had probable cause because he called Agent Dox of the FBI to try to get him to investigate a bank fraud. He stated that he called the FBI because he did not know how to continue the investigation.[15] This occurred within less than twenty-four hours from the time of the seizure, a not unreasonable time given the nature and extensiveness of the materials seized and his mandate to supervise Defendant carefully. The Court is satisfied, therefore,

---

15. The Court notes that Mr. Frost only had to have probable cause that the Court would be reasonably satisfied that a crime had been committed and, therefore, a violation of probation had occurred. *See United States v. Warner,* 830 F.2d 651, 655 (7th Cir.1987); *United States v.*

*Guadarrama,* 742 F.2d 487, 489 (9th Cir.1984). He wanted to share the information with the FBI, which in investigating criminal violations would have a different scope of investigation and need for a higher standard of proof.

that Probation Officer Frost conducted his examination of the documents with reasonable diligence. The fact that further work with the materials would be needed by Frost later to prepare his case for the arrest warrant is immaterial once probable cause had been developed.

There is no evidence concerning what Probation Officer Frost told Defendant about the materials he had seized and the length of the expected detention. There is also no evidence indicating that Defendant attempted in any way to get any of the materials back, either by motion or through requests to Probation Officer Frost. The Court is not able, therefore, to evaluate the degree of intrusiveness of the detention to the point of development of probable cause on Defendant's possessory interest.

Given the nature of the items seized, the length of the detention, and Defendant's status as a probationer, which required much closer supervision and control of him and his possessions than would be acceptable in ordinary circumstances, the Court does not find that the detention of Defendant's property was unreasonable.

### Probation Act

■ Defendant contends that the search here was impermissible under the probation statute mandating the duties of probation officers, 18 U.S.C. § 3603. Section 3601 of title 18, United States Code, provides that a probationer shall be supervised by a probation officer to the degree warranted by the conditions specified by the sentencing court. Section 3603 provides in pertinent part that the officer keep informed, to the degree required by the conditions, as to the conduct of probationer, and his compliance with the conditions, and that he use all suitable methods to aid a probationer under his supervision to bring about improvements in his conduct.

Specifically, Defendant asserts that the search here was merely a means of harass-

ing Defendant and part of a larger pattern of harassment and misconduct by Frost and Detective Barker. Although Probation Officer Frost was admittedly suspicious of Defendant and had opposed the probationary sentence imposed by the Court, the Court finds no evidence that he harassed Defendant or was in any way violating his duties as a probation officer. Frost conducted the customary in-office supervisory visits with Defendant. Because the Court also had doubts about Defendant's ability to succeed on probation, Frost was also charged with exerting the most rigorous sort of probation control over Defendant, Sentencing Transcript at 63, that is, "walking right behind [Defendant] if not in [his] hip pocket." *Id.* at 44. The reason the Court imposed such stringent supervision measures was not to harass Defendant, but rather to prevent him from reverting to what admittedly for him was an exciting, if dangerous, criminal lifestyle. Defendant and his counsel acknowledged prior to imposition of sentence that knowledge of the close scrutiny would act as a beneficial deterrent. The Court contemplated surveillance when it imposed the sentence and is satisfied that Defendant understood he would be closely watched. Surveillance in this context does not constitute harassment.

That Probation Officer Frost was not harassing Defendant by searching his house, but merely trying to fulfill his obligation under the Probation Act and the Court's sentence, is underscored by the fact that Frost waited until he was convinced "in [his] mind" that probation violations were occurring. Frost investigated various leads and obtained evidence that Defendant had traveled out of state. He methodically checked the information that he received relating to possible fraudulent activity. Only after he caught Defendant in *flagrante delicto*, driving after his license had been suspended,[16] and received

---

16. Defendant cites Frost's conduct in this regard as particularly egregious. Defendant seems to argue that Frost's reporting of the incident to police was harassment, since "Frost was aware of the fact that there had been threats on Defendant's life and that Defendant was to spend the

rest of his life looking over his shoulder as a result of his undercover work." Defendant's Memorandum in Support of Motion to Suppress at 12. A probation officer would be violating his duties, however, if he did not report wrongdoing by a probationer. *Minnesota v. Murphy,*

information from a known Government witness that Defendant carried a gun, and therefore might pose a threat to the community, did Frost decide to search Defendant's house for evidence of probation violations.

Defendant also suggests that the surveillance of Defendant and search of his home were a subterfuge for a police investigation, a purpose that would be unreasonable under the Probation Act and under the Fourth Amendment. *See Consuelo–Gonzalez*, 521 F.2d at 267. The record cannot support that conclusion. Probation Officer Frost had the strongest mandate possible to keep Defendant under close supervision, and he had begun to investigate certain aspects of Defendant's behavior that seemed incongruous to him.[17] After that, Detective Barker called for information on Defendant, because he was suspicious of a possible insurance scheme involving Boucher and a stolen and stripped BMW. While Frost and Barker exchanged information, it is plain that the investigation conducted by Frost related to possible probation violations. He checked to see whether Defendant had left the jurisdiction, as reported, and found that he had on numerous occasions; he checked to see with whom Defendant was associating to determine if he maintained contact with criminals; he ob-

served the comings and goings at Defendant's house; and he followed up leads suggested to him by his own investigation and Detective Barker's to see if Defendant might be committing crimes in violation of his probation conditions. The record demonstrates a pattern of stringent probation surveillance and supervision. That there was cooperation by the police with Probation Officer Frost on some of the points of his concern does not make the investigation one instigated or controlled by the police. *See United States v. Jarrad*, 754 F.2d 1451 (9th Cir.1985); *United States v. Consuelo-Gonzalez*, 521 F.2d at 267.

The search here was conducted by Probation Officer Frost because he was subjectively convinced that Defendant had been violating his probation and he wanted to look for confirming evidence of those violations. When he was convinced of the violations, Frost initiated the search and he asked Detective Barker to assist him. Such assistance is commonplace and often advisable. *See United States v. Consuelo-Gonzalez*, 521 F.2d at 267. Although Detective Barker was conducting an investigation of Defendant and Peter Boucher, there is no evidence in the record to support a finding that Barker initiated, instigated, or controlled the search and seizures conducted on June 30.[18] When the search

465 U.S. 420, 432, 104 S.Ct. 1136, 1144, 79 L.Ed. 2d 409 (1984) (quoting *Fare v. Michael C.*, 442 U.S. 707, 720, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979)).

Defendant also argues that special procedures constituting harassment were used in arresting Defendant on a warrant for the offense rather than issuing a summons. The Court finds no support for this idea. There is no suggestion that the procedures used in Defendant's case were unlawful. Although Defendant contends that police normally issue summonses for operating under suspension, the Court understood Officer Maloney to say that he issued summonses when he, personally, had seen the offense, Suppression Hearing Tr. at 203, and that he could not remember whether he had used an arrest warrant if he were relying on another witness because he did not remember ever having done that. *Id.* at 202.

17. Frost was somewhat suspicious when Defendant's disclosure of assets, filed shortly after sentencing, listed numerous vehicles and a boat since at sentencing it had been represented that Defendant had no assets with which to pay a

fine. Passing by Defendant's house on March 13, 1988 to check on the cars parked there, Frost also discovered the new BMW, sold to Boucher with Defendant's involvement and funds provided by Defendant's father.

18. *Defendant also suggests that FBI Agent Dox's conduct on the morning of the second search provides evidence that the search was a subterfuge for criminal investigation. The Court cannot agree. Agent Dox had begun an investigation of Defendant and Peter Boucher in mid-August. He learned that there was to be a search and an arrest of Defendant on September 2. Neither Frost nor the Deputy United States Marshal asked Dox to be present, but he decided independently to be present if they did not mind. Dox wanted to interview Peter Boucher, and he waited outside the house until Boucher came out. During the interview, Boucher gave the deputy marshals his consent to a search of his automobile and apartment. After the consent had been given, Dox searched a trash can outside the apartment, recovering some documents. He also assisted Deputy Marshal Or-*

had been completed, Detective Barker executed the outstanding arrest warrant for operating under suspension, not on any pretext but because he knew from Frost that it existed, knew that he would be accompanying Frost on the search, and knew that the warrant "had to be taken care of." Suppression Hearing Tr. at 214. The Court is satisfied that Probation Officer Frost acted suitably and reasonably to supervise Defendant as the Court had intended and that his supervision met the standards of the Probation Act.

*Exclusionary Rule*

Since the Court finds that the search and seizure complained of here were reasonable, it need not address the question ultimately posed: whether the exclusionary rule applies to probation revocation cases.

ORDER

Accordingly, it is ORDERED that Defendant's Motion to Suppress be, and it is hereby, DENIED.

lando in searching a red Jeep Cherokee. He took items handed to him by Orlando, looked at them, and gave them to Frost. Although Dox may have wanted to profit from the general commotion to interview Boucher, there is no indication that he was the impetus behind the search and seizure of any items, other than those found in the trash can, and that search was conducted under a valid consent from Boucher. It seems clear from Dox's testimony that he wanted to stay out of the way and let Frost and the deputy marshals conduct their business and that he provided assistance when necessary. His presence did not convert the search into one for criminal investigation purposes and he conducted no impermissible searches. *See United States v. Jarrad,* 754 F.2d 1451.