**UNITED STATES of America**

v.

**James GIANNETTA.**

**Crim. Nos. 86–00035–01–P, 86–00063–04–B.**

United States District Court, D. Maine.

July 7, 1989.

---

William H. Browder Jr., Margaret D. McGaughey, Asst. U.S. Attys., Portland, Me., for plaintiff.

Judy Potter, Cape Elizabeth, Me., for defendant.

GENE CARTER, District Judge.

## MEMORANDUM OF DECISION AND ORDER ON PETITION FOR PROBATION REVOCATION

Vincent J. Frost, a Probation Officer of this Court and supervising Probation Offi-

cer of Defendant, has alleged in a petition filed August 24, 1988, and in a supplement to the petition filed September 15, 1988, that Defendant has violated Conditions 1, 2, 10 and 12 of his probation. On February 26, 1988, the Court suspended imposition of sentence and placed Defendant on probation for a period of five years. The usual terms and conditions of probation were imposed[1] and were read to and discussed with Defendant, including specifically:

(1) You shall not commit another federal, state or local crime during the term of supervision;

(2) You shall not leave the judicial district or other specified geographic area without the permission of the Court or the probation officer;

(10) You shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

(12) You shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

On September 2, 1988, Defendant was arrested on a warrant issued by this Court. A probable cause hearing was held on September 6, 1988, at which Probation Officer Frost testified. Finding probable cause to believe that Defendant had violated the conditions of his probation, the Court ordered him held for a revocation hearing. Defendant moved for admission to bail pending the revocation hearing and a bail hearing was held on September 30, 1988. That motion was denied by order of October 7, 1988. 695 F.Supp. 1254. Defendant filed a motion to suppress evidence seized in two searches conducted by Probation Officer Frost under the special condition of probation. A hearing was held on that motion on January 23 and 24, 1989. The motion to suppress was denied by order dated April 14, 1989. 711 F.Supp. 1144. Finally, on May 22, 1989, the probation revocation hearing was held. The transcripts of the prior three hearings as well

---

1. A special condition not directly pertinent here was also imposed.

as the transcript of Defendant's sentencing hearing were all made a part of the record for the probation revocation hearing.

■ In order to revoke Defendant's probation, the Court must find that Defendant violated the conditions of his probation and, further, that there is reason to now incarcerate him. *See* Advisory Committee Notes, Fed.R.Crim.P. 32.1(a)(2). There need not be proof beyond a reasonable doubt that violations have occurred, *United States v. Francischine,* 512 F.2d 827, 829 (5th Cir.1975), but the Court must be reasonably satisfied that Defendant's conduct "has not been as good as required by the conditions of probation." *United States v. Verbeke,* 853 F.2d 537, 539 (7th Cir.1988); *United States v. Guadarrama,* 742 F.2d 487, 489 (9th Cir.1984).

### Condition 1

■ Probation Officer Frost testified to two alleged violations of the law which occurred in his presence. First, on May 3, 1988, after Defendant had been told that he could not travel out of the district without a Court order, Suppression Hearing Tr. 49–50, he asked Probation Officer Frost if he could travel to Massachusetts that day. Upon having his request denied, Defendant persisted, asking Frost what he could do or if Frost could do something. After Frost's negative reply, Defendant "leaned across Frost's desk … and whispered, 'why don't you close the door and tell me what I have to do.'" Revocation Hearing Tr. 17; Suppression Hearing Tr. 50. Frost interpreted Defendant's behavior as an attempt to bribe him, in violation of 18 U.S.C. § 201. The Court finds no reason to doubt Frost's uncontradicted version of the event and his

interpretation of it, as an experienced probation officer, seems very reasonable.

Frost also observed Defendant driving on June 13, 1988, when his license was under suspension. Although the charge was ultimately dismissed before adjudication, a warrant was issued for Defendant's arrest, and Defendant admitted to Frost when he was confronted that indeed he had been driving after suspension. The Court finds, therefore, that Defendant violated 29 M.R.S.A. § 2298.[2] Suppression Hearing Tr. 72. The fact that the charge was dismissed does not affect the status of the offense for probation revocation purposes since the dismissal occurred before the merits of the case were addressed. *See United States v. Granelli,* 558 F.2d 1042 (1st Cir.1977).[3]

Based on Probation Officer Frost's investigation,[4] the petition also alleges that Defendant submitted a false automobile loan application to the New Hampshire Savings Bank on April 20, 1988. On the application, Exhibit 138, which Probation Officer Frost obtained through a court order, Defendant represented himself as the owner of Leisure Leasing, Inc., with an annual salary or wages of $75,000. While Defendant may have received money from his father as a gift, he had reported to Frost in March and April that he was unemployed, and that he had not filed an income tax return for 1987 because he had no income. Defendant told Frost that he was trying to start Leisure Leasing, Inc. again, and in June 1988 he told Frost that he was selling cars and trucks. He stated that he had sold his Corvette for $14,000 and had made $500 on other sales. The Corvette had previously been valued as a $13,000 asset by Defendant, so by June, from these exertions, he had $1500 of profit. Suppression

---

**2.** This finding is based upon evidence independent of that found in the search conducted by Probation Officer Frost.

**3.** The charge against Defendant was dismissed *in part* because of a *potential* competing harms defense under 17–A M.R.S.A. § 103. Before this Court also Defendant has tried to cast his crime as one committed only out of real fear for his own safety. It is plain, however, that no competing harms defense exists for there was no imminent physical harm *in fact* threatened.

*State v. Greenwald,* 454 A.2d 827, 829, 830 n. 6 (Me.1982). Mr. Frost posed no physical threat to Defendant.

Even if Defendant's fear existed, in the Court's view it does not even mitigate the situation for the reasonable thing to do in such a situation would be to call the police.

**4.** This investigation also was independent of the searches later conducted by Probation Officer Frost.

Hearing Tr. 34; Probable Cause Hearing Tr. 45–46. The Court finds it highly unlikely that Defendant had an annual salary of $75,000 in April 1988 since by June he had only made $1500.

Defendant argues that he had large sums of money in gifts from his father and therefore did not have the requisite intent to defraud. This is a specious argument, however, since the application asked for salary or wages, *i.e.,* earned income. If he was relying on gifts from his father to make him eligible for the loan, he should have disclosed that fact to the bank so it could properly evaluate it. The Court finds it highly likely, therefore, that Defendant misrepresented his annual salary on the loan application, in violation of 18 U.S.C. § 1344[5] (bank fraud) and 18 U.S.C. § 1014 (false loan application).

Title 18 U.S.C. § 922(g) makes it a crime for a convicted felon to possess ammunition that has been transported in interstate commerce. Probation Officer Frost had been told by Robert Reno, after Defendant's sentencing, that Defendant always carried a gun, and Keith Lorentsen testified that he had seen a gun in Defendant's room a few weeks before the search on June 30, 1988. During the search, Probation Officer Frost found ammunition both separately and in a clip in a bedside table in Defendant's apartment. Defendant's father testified that he had taken Defendant's gun from him on the day of sentencing, but had told him to keep the clip. The Court finds it highly likely that Defendant possessed ammunition in violation of section 922(g).

■ Defendant argues that the offense has not been made out because it must be established that the subject firearm or ammunition previously moved in interstate commerce. He asserts that the purpose of the Act is to prohibit felons from shipping or transporting weapons in interstate commerce or from receiving any such article which has been shipped or transported in interstate commerce. Based on a recent opinion by the Court of Appeals for the First Circuit, the Court reads the statute more broadly. In *United States v. Gillies,* 851 F.2d 492, 494–95 (1st Cir.1988), the court stated that

> one can read the language "possess in or affecting commerce, any firearm" as serving a jurisdictional purpose, making clear that Congress wished to exercise its Commerce Clause power broadly in order to achieve a crime control objective, namely stopping convicted felons from possessing guns. If so, the effect on commerce to which Congress refers could include the effect that permitting (or forbidding) a person or persons of this sort to possess interstate guns will have on interstate commerce, Congress's object being to show not necessarily an *injury* to commerce, but rather simply to show *some effect* for jurisdictional reasons.

.　　　.　　　.　　　.　　　.

> A Congress that wanted to expand § 922(g)'s jurisdictional reach to include past, present and (possibly) future connections with interstate commerce, expanding the crime to include more than just receipt or transport, might have preferred to use a single, highly general word with a history such as "affecting" rather than to write a far longer statute using several clauses in different tenses. . . .

Given the broad reading of the statute, the Court is satisfied to the extent necessary for this proceeding that Defendant violated section 922(g).

The Court heard extensive testimony from Keith Lorentsen concerning an elaborate check kiting scheme engineered by Defendant and carried out by him and others, including Lorentsen, Kelli Haines, and Victor Loveitt, in May and June 1988. The scheme involved procuring false identifications in Vermont, Massachusetts, and Maine in May and opening bank accounts in

---

5. Section 1344(b)(2) provides that "Whoever knowingly executes, or attempts to execute, a scheme or artifice—to obtain any of the moneys, funds, credits, ... owned by ... a federally chartered ... financial institution by means of false or fraudulent pretenses, representations ... shall be fined not more than $10,000 or imprisoned not more than five years or both."

various banks throughout New England in the fictitious names. Using the checks and money cards that were issued, carefully timed deposits and withdrawals were made at the banks, as Lorentsen described it, "covering bad checks with other bad checks." Lorentsen was told only to use the cards at Defendant's direction, money withdrawn was given to Defendant, and Defendant paid Lorentsen for his participation. False identification materials and checks, money cards, and bank statements in the names testified to by Lorentsen were all found in Defendant's apartment at the time of the June 30, 1988 search, as was a diagram or plan of the scheme, identified by Lorentsen and labeled "10 day program." Exhibit 84. Given the documentary materials found and the believable testimony of Lorentsen, the Court finds it highly likely that Defendant violated 18 U.S.C. § 1344 (bank fraud) and section 1029 (concerning access devices). Lorentsen testified that the bank documents were mailed to him in his various fictitious names at mail drops which he procured at Defendant's behest. The Court is persuaded, too, that Defendant was, therefore, an abettor in a mail fraud, in violation of 18 U.S.C. §§ 2, 1342.

During the June 30 search, Probation Officer Frost also found among Defendant's possessions a piece of mail addressed to Jacqueline Ganem and mailed May 31, 1988. Kelli Haines, an associate of Defendant in the above-described bank fraud scheme, lived in Ms. Ganem's apartment building. Ms. Ganem told Probation Officer Frost that she never received this piece of mail, a bank statement, and had not authorized anyone to take it.[6] The Court finds it highly likely that Defendant, who was involved in numerous bank fraud schemes, knew that Ganem's bank statement was stolen. Thus, his possession or receipt of it violated 18 U.S.C. § 1708.

When Frost conducted the June 30 search, he found a Rolex watch which Loveitt, according to Lorentsen, had tried to hide. Loveitt had used the false name of Craig Wyman earlier that day to purchase the watch from Springer's Jewelry in Portsmouth, New Hampshire. As Frost arrived, Loveitt tried to flush away the false identification in Wyman's name. Employees of the store identified Defendant as having been in the store earlier with Loveitt to inquire about the watch. The owner of Springer's also identified Defendant's car as having pulled away from the store after Loveitt had purchased the watch using a credit card number issued to Pelletier and Flannagan, a construction firm. The only testimony that use of the credit card number was unauthorized came from Probation Officer Frost, without foundation. The Court infers, however, from the circumstances that this was indeed the case. Not only was Loveitt trying to hide the watch and dispose of the false identification papers, but Lorentsen was instructed to remove various parts of Defendant's car and dispose of it. According to Lorentsen, Defendant wanted to report the car stolen because the owner of the store where the Rolex had been purchased had noted the license plate number after Loveitt left in it. Unauthorized use of a credit card number violates 18 U.S.C. § 1029.

Lorentsen also testified that he aided Defendant in one insurance fraud scheme. At Defendant's request, he moved automobile parts from one storage area to another. Defendant and his roommate, Peter Boucher, told him the parts had been stripped from a BMW that had been reported stolen. Defendant and Boucher were going to buy the car back from the insurance company and put it back together with the stored parts. Lorentsen's testimony is corroborated in part by the testimony of Probation Officer Frost, who had been informed by Detective Reed Barker of the

---

6. Although Ms. Ganem's statement was presented by Probation Officer Frost, the Court does not find that use of this hearsay unfairly violates Defendant's right to confrontation. Ms. Ganem's bank statement was found in Defendant's house along with a multitude of other bank documents, in names other than Defen-

dant's. As described above, these are evidence of fraud. One can infer from this fact, and the fact that one of Defendant's partners in fraud lived in the building to which the mail was addressed, that the statement was stolen. Ms. Ganem's hearsay statement merely corroborates that inference.

South Portland Police Department that he suspected insurance fraud in the case of a BMW reported stolen by Boucher and later found stripped. The Court finds it highly likely that Defendant was at least an accomplice under Maine law, 17–A M.R.S.A. § 57, to the crime of filing false insurance claims and proofs of loss. 24–A M.R.S.A. § 2178. Alice Cunio corroborated some of the details of this scheme:[7]

Alice Cunio testified that she filed a false insurance claim for Defendant on a Mercedes automobile belonging to Defendant's friend, Philip Ward. She got an estimate on the car and Defendant filed the papers with the insurance company, listing her as the claimant. Cunio received the check, endorsed it, and deposited it. She later wrote one of her own checks to Defendant for the amount she received. Ms. Cunio was a highly credible witness. Based on her testimony, the Court finds it very likely that Defendant committed insurance fraud in violation of Maine law, 24–A M.R.S.A. § 2178, and quite possibly also in violation of 18 U.S.C. § 1341 or 1343.

Defendant also signed his father's name on an automobile loan application to Key Bank on March 31, 1988. *See* Exhibit 46. His father testified that he did not sign the application, and Probation Officer Frost recognized the signature as that of Defendant. Although Defendant's father testified that Defendant was authorized to sign for him, the Court does not believe this testimony. There was a highly defensive tone and manner to Frank Giannetta's testimony, and the Court believes that he was trying *post hoc* to vindicate his son's fraudulent conduct. Moreover, whether Defendant was authorized to sign for his father or not, he did not sign as a person authorized to sign for someone else but merely represented by signature that he was his father for purposes of getting the bank to issue the loan. It is highly likely that this conduct violated 18 U.S.C. §§ 1344 and 1014.

From the evidence presented at the various hearings, the Court is persuaded by far more than a preponderance of the evidence that Defendant, in numerous ways, violated Condition 1 of the terms and conditions of his probation.[8]

### Condition 2

The Probation Department has also alleged that Defendant traveled outside the District of Maine without permission numerous times, in violation of Condition 2 of the terms and conditions of probation. Probation Officer Frost heard a report that Defendant had been in Newington, New Hampshire in March 1988, and his investigation also led him to suspect that Defendant had been at an automobile dealership in Concord, New Hampshire in April 1988. Frost presented a photo array, including Defendant's photograph, to the security guards at Filene's in Newington and to employees of Nault's Lincoln Mercury in Concord, who identified Defendant as having been in their places of business in March 1988 and on April 20 and 22, 1988, respectively. Documents from these businesses also support these allegations.[9]

---

**7.** Both Lorentsen and Cunio also testified about a staged accident involving Boucher and Haines. Although both discussed the plan in detail, there was little evidence of Defendant's involvement. Lorentsen said that the scheme was Defendant's idea, but there was no other amplification or corroboration of this. On the basis of such sparse evidence, the Court will not use these allegations as a basis for its finding that Defendant breached Condition 1.

**8.** The Probation Department has also alleged that Defendant used a stolen credit card for purchases made at K–Mart. The only evidence of the violation alleged, however, were police reports and the hearsay statement of a Cape Elizabeth police officer presented through Probation Officer Frost. The Court is unwilling to base its decision to revoke Defendant's probation on such hearsay because Defendant did not have an adequate opportunity to confront the accusing officer. *See United States v. Bell,* 785 F.2d 640, 644 (8th Cir.1986).

The Court notes, however, that it is satisfied, based on Keith Lorentsen's testimony, that Defendant did use a stolen credit card—that of Robert Scott—knowing that it had been stolen by Lorentsen. This conduct violates 18 U.S.C. § 1029.

**9.** The Court is satisfied that these three probation violations are adequately established without reference to any of the materials seized in the searches of Defendant's house by Probation Officer Frost.

Similarly, Frost's investigation into the purchase of a Rolex watch, found in the June 30th search of Defendant's house, led to a jewelry store in Portsmouth, New Hampshire, where a clerk identified Defendant from a photo array as having been in the store that day. Defendant did not have permission to travel outside the district on any of these occasions.

The Government also presented credit card slips from businesses in Massachusetts and New Hampshire signed by Defendant and dated between April and August 1988. Probation Officer Frost, who knows Defendant's signature, testified that the signatures on the slips were Defendant's. The Court, therefore, finds that on the numerous occasions indicated, Defendant has left the District of Maine without permission, in violation of Condition 2 of the terms and conditions of his probation.

### Condition 10

Defendant is also charged with associating without permission with persons engaged in criminal activity or convicted of a felony, in violation of Condition 10 of his probation. Keith Lorentsen testified that Defendant associated with him while he was engaged in criminal activity known to Defendant. The testimony of Lorentsen and Alice Cunio also establishes to the Court's satisfaction, for purposes of this proceeding, that Peter Boucher, Kelli Haines, and Victor Loveitt were engaged in criminal activity known to Defendant and that Defendant associated with them. Boucher was Defendant's roommate; Haines, according to Cunio's testimony, was a frequent visitor at Defendant's house; and Loveitt was there trying to flush a false ID on the day of Frost's first search. Defendant had met Lorentsen in

jail so he clearly knew that Lorentsen was a convicted felon also. The Court is satisfied that Defendant violated Condition 10 of the terms and conditions of his probation.[10]

### Condition 12

■ The Probation Department also charges that Defendant violated Condition 12 of his probation, requiring him to report to his probation officer if he were questioned by police. Specifically, Defendant is charged with not reporting questioning on several occasions by Detective James Langella, for whom he had been a confidential informant prior to sentencing, and by Officer Sinclair of the Cape Elizabeth Police Department regarding use of a stolen credit card. The only proof of these alleged violations was testimony by Probation Officer Frost that the police officers had reported the questioning to him and a police report on the K–Mart credit card incident. The Court does not doubt Probation Officer Frost's testimony. However, the use of such hearsay, when there has been no showing that the local police officers could not easily have testified, trenches too much on Defendant's right to confrontation. *See United States v. Bell,* 785 F.2d 640, 644–45 (8th Cir.1986). Based on the evidence before it, which was not sufficiently subject to cross-examination, the Court will not find a violation of Condition 12.[11]

### Conclusion

Based on the extensive record before it, the Court finds overwhelming evidence that Defendant has violated the conditions of his probation, not just once but many times, over virtually the whole period of his probation until the time of his arrest.

---

**10.** The Probation Department also alleged that Defendant had associated with Biaggio Barone and Bruce Wellman, both of whom are incarcerated. Barone was in telephone contact with Defendant after he was sentenced, and Wellman corresponded with Defendant. The Court is troubled by those communications and thinks that they are of the type which the condition was intended to address. The record does not indicate, however, what was explained to Defendant about this prohibition and whether he understood "associate" to mean to communicate by telephone and mail. The Court will not,

therefore, use these contacts as a basis for its decision.

**11.** The only evidence on this issue was presented at the probable cause hearing on September 6, 1988 in response to defense counsel's questioning. Because of the way the record was developed here, by incorporation of the previous transcripts, Defendant did not have an appropriate opportunity to make a confrontation clause, hearsay objection.

While one foray out of the district or a chance encounter with Lorentsen might have been considered a technical violation of the conditions, it is clear that here the Court is confronted with an ongoing pattern of flagrant disregard of the terms and conditions of probation.

At the probation revocation hearing, defense counsel presented testimony by Dr. Saunders to the effect that Defendant's failure on probation was due to a failure of supervision—specifically that he should have been required to check in more frequently and should have been required to have a job. Defendant has also argued that Probation Officer Frost was remiss because he failed to provide rehabilitation. The Court emphatically rejects the suggestions that anyone other than Defendant himself is responsible for the long list of prohibited conduct in which he has engaged and that Probation Officer Frost's performance of his duties in supervising Defendant were in any way deficient. Probation Officer Frost saw Defendant for regular supervisory visits in addition to the surveillance conducted. The *Court* firmly believed from the beginning that strict supervision of this Defendant was imperative. Probation Officer Frost provided the level of supervision required by the Court and did so at the direction of the Court. Defendant's suggestion is ridiculously untenable that he should have been permitted to return to and work in Massachusetts, where he had numerous criminal contacts, and where he acknowledged before imposition of sentence that his life would be fraught with illegal temptations which would surely test his resolve. He represented with great vigor to the Court, in answer to the Court's questions prior to imposition of sentence, that he intended to find work and make a new life in the Portland, Maine area because of his own recognition of the hazards that life in Massachusetts would pose to his successful completion of probation. Defendant's request to return to the District of Massachusetts was rejected *by the Court* when presented on motion for ample good reason. The Court is convinced that his principal motive in making such a request was to escape from the stringent supervision imposed by this Court by changing the venue of his supervision to Massachusetts.

The Court's dominant concern in placing Defendant on probation was that he reveled in the excitement of dangerous criminal activity and that he, therefore, would not be able to resist its temptation. This character trait was noted at sentencing not only by the Court but by defense counsel and by Defendant himself. At the probation revocation hearing, Dr. Saunders also referred to Defendant's need for stimulation. The Court is convinced, however, that Dr. Saunders drew only incorrect conclusions as to the significance of that fact in evaluating the reasons for Defendant's failure to comply in any significant respect with the conditions of his probation. It is plain to the Court that Defendant indeed cannot resist the temptation to live on the edge of danger. He has the intelligence and the skills that would have enabled him to succeed on probation, with the assistance of Probation Officer Frost, if he had had any intention to do anything other than to evade all of the restrictions that were placed upon his activities.

The evidence before the Court demonstrates that this Defendant has had throughout the period of his admission to probation the utmost disdain for even the most nominal obligations he undertook as part of his probation and a contemptuous disrespect of the law. It has been amply demonstrated that Defendant is the knowing, deliberative, and arrogant architect of his own unhappy straits. Any suggestion that his plight is in any respect the result of any defect in Probation Officer Frost's performance of his duties is, in the real world of criminal rehabilitation, fatuous in the extreme.

The Court simply cannot disregard Defendant's infractions of the conditions of his probation. The flagrant circumstances surrounding the infractions require that probation be revoked. Defendant has clearly shown himself unable to conform to the conditions of his probation even after it was plain to him that Probation Officer Frost, through his June 30 search, would

assuredly know of his prior violations. Defendant cannot be relied upon in the future to conduct himself as the conditions of probation require or to conform his conduct to any acceptable approximation of the role of a law-abiding person.

Accordingly, it is hereby *ORDERED* that Defendant's probation be, and it is hereby, *REVOKED.* The Clerk will schedule the case for imposition of sentence as soon as this Court's schedule will permit.

So ORDERED.